[No. B045636. Second Dist., Div. Seven. Apr. 24, 1990.]

MARILENA LEIGHTON, Plaintiff and Appellant, v.
OLD HEIDELBERG, LTD., Defendant and Respondent.

## COUNSEL

Dennis F. Moss for Plaintiff and Appellant.

Morris, Polich & Purdy, Robert S. Wolfe and John A. Marder for Defendant and Respondent.

## OPINION

**LILLIE, P. J.**—Plaintiff sued defendant Hoppe's Old Heidelberg Restaurant in the municipal court for damages for wrongful discharge alleging she was fired from her employment as a waitress for refusing to share her tips with the busboys; breach of the covenant of good faith and fair dealing,

based on the same facts; unpaid split shift premiums (Cal. Industrial Welf. Com. Wage Orders) and attorney's fees (Lab. Code, § 218.5); and repayment of all moneys paid by her to busboys and bartenders under an employer-mandated tip-pooling arrangement. On defendant's motion, summary judgment in favor of defendant and against plaintiff was entered. The judgment was affirmed by the appellate department of the superior court which certified its opinion for publication. We deemed the issue of the legality of employer-mandated tip pooling among employees to be of statewide importance and issued an order transferring the cause to this court. (Cal. Rules of Court, rule 62a.)

MOTION FOR SUMMARY JUDGMENT

The following facts were undisputed: Plaintiff was hired as a waitress by defendant restaurant in August 1984, and terminated on February 14, 1987, for refusing to pool her tips with the busboys; she worked split shifts— lunch (11 a.m.-2 p.m.) and dinner (6 p.m.-10 p.m.); between shifts, she did not work and went home. Plaintiff was told when she was hired that she must share her tips with the busboys, and the general procedure was that she share the tips with the busboy who works the same tables on which she waits; she refused to automatically pay the busboys 15 percent; she had no written agreements or contracts regarding her employment with defendant.

In support of its motion, defendant submitted a portion of plaintiff's deposition taken August 16, 1988, and copy of Determination of California Office of Administrative Law (1987 AOL Determination No. 4 [docket No. 86-010]).

On deposition plaintiff testified that after she was hired in August 1984 she worked the first couple of months at night, then started working lunch and dinner; she did not work in the hours between; such shifts are known in the restaurant business as split shifts; she went home between 2 p.m. and 6 p.m.; while working at the restaurant, she remembered talking about the split shift but did not recall if she signed any document concerning it; shown the affidavit signed by her under penalty of perjury, and asked if she recognized it, she answered, "I really don't know exactly. I don't remember, I don't remember it," then admitted she recognized her signature at the end but, asked if she signed it, said, "I didn't say that, I just don't remember." Further, she testified that when she was hired, the manager told her she was required to share her tips with the busboys, and explained one of the procedures was that the waitresses had to pool their tips with the busboys; on February 14, 1987, she refused to do so.

The following affidavit was signed by appellant:

"TO WHOM IT MAY CONCERN

"I am employed as a waitress by Hoppe Enterprises, Inc., dba Old Heidelberg at 13726 Oxnard Street, Van Nuys, California 91411.

"Under the penalty of perjury, I state, that my services as a waitress are available to the Old Heidelberg only during their luncheon and/or dinner business and not during any hours falling between those two periods.

"Obligations to my family and other personal commitments prevent me from working at the Restaurant during any of the afternoon hours. By limiting my working hours in that manner, I am able to earn adequate compensation during hours of my choice and at my convenience."

In opposition to motion for summary judgment, plaintiff submitted her declaration, and a statement signed by defendant for the office of unemployment.

In her declaration, plaintiff stated that shortly after she was hired, defendant presented her with the affidavit and told her to sign it; she signed it because, "I did not want to make waves"; she did not know at the time that she would be entitled to extra pay if she worked split shifts, and she was available to work between shifts even though she signed the affidavit, and when the owner asked her to work during that period, she did; the restaurant did not require a full complement of waitresses between lunch and dinner, and she signed the affidavit for the restaurant's convenience. She further stated in her declaration that when she was hired, and throughout her employment she was told to give 15 percent of her tips to the busboys and 5 percent to the bartender; she complied to keep her job; she felt the tips were hers to do with as she pleased and it was the responsibility of management to pay bartenders and busboys; on February 14, 1987, she felt the "busboys were not nearly as helpful or cooperative as [she] felt they should be" and refused to share her tips with them that day; she was suspended for 10 days; when she returned to work she was asked by management if she would comply with their tip requirements, and when she indicated she might if the busboys did their job, she was fired.

In a statement to the unemployment office regarding plaintiff's termination, defendant stated that plaintiff well knew that tip pooling was a "house rule and is with nearly all Restaurants"; she refused to pay the busboy 15

percent of the tips and he was going to quit because of it; management requested she pay the busboy and she refused; she was suspended for a week; when she returned, her attitude was unchanged and she would give no tips to the busboy unless he gave her special attention; she was discharged because she gave less than first-class service and was insubordinate and uncooperative.

I

### EMPLOYER-MANDATED TIP POOLING NOT PROHIBITED BY LABOR CODE SECTION 351

■■■ Plaintiff contends there is a triable issue of material fact as to whether or not she was wrongfully discharged, thus the judgment must be reversed. However, we perceive only a question of law, for her wrongful termination suit can succeed only if employer-mandated tip pooling among employees is prohibited by Labor Code section 351 (section 351).

No reported California judicial decision has interpreted section 351 to apply its prohibitions to employer-mandated tip pooling. *Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690 [166 Cal.Rptr. 331, 613 P.2d 579] and *Henning* v. *Industrial Welfare Com.* (1988) 46 Cal.3d 1262 [252 Cal.Rptr. 278, 762 P.2d 442] detail the legislative history of section 351 and deal with the matter of subminimum wage, but neither case addresses the issue. While the language of the statute expressly prohibits various employer practices, there is no mention therein of employer-mandated tip pooling, or of any kind of tip pooling among employees. Tip pooling has been around for a long time, as has section 351, and had the Legislature intended to prohibit or regulate such practice, it could have easily done so, just as it prohibited the various enumerated employer practices. Further, we find nothing in the legislative history of section 351 or related sections, which precludes such an arrangement. And, as far as we can determine, California has no established policy against tip pooling among employees mandated by the employer. To the contrary, the restaurant business has long accommodated this practice which, through custom and usage, has become an industry policy or standard, a "house rule and is with nearly all Restaurants," by which the restaurant employer, as part of the operation of his business and to ensure peace and harmony in employee relations, pools and distributes among those employees, who directly provide table service to a patron, the gratuity left by him, and enforces that policy as a condition of employment.

The Legislature expressly provided[1] that no employer shall "collect, take, or receive" any part of a gratuity left for an employee by a patron or engage in certain other enumerated practices, declaring each such gratuity to be the "sole property" of the "employee or employees" for whom it was left. The purpose of section 351, as spelled out in the language of the statute, is to prevent an employer from collecting, taking or receiving gratuity income or any part thereof, as his own as part of his daily gross receipts, from deducting from an employee's wages any amount on account of such gratuity, and from requiring an employee to credit the amount of the gratuity or any part thereof against or as a part of his wages. ■ And the legislative intent reflected in the history of the statute, was to ensure that employees, not employers, receive the full benefit of gratuities that patrons intend for the sole benefit of those employees who serve them. Thus, our Supreme Court has prohibited a reduction, either directly or indirectly, of an employer's minimum wage obligation by virtue of tips received by an employee (*Industrial Welfare Com.* v. *Superior Court, supra,* 27 Cal.3d 690, 730), and employers from paying tipped employees a subminimum wage. (*Henning* v. *Industrial Welfare Com., supra,* 46 Cal.3d 1262, 1265.)

■ But Old Heidelberg has engaged in none of these practices. It does not "take, collect, or receive" as its own any part of a gratuity left by a patron; it does not credit tips against wages it owes the employee; it pays none of its tipped employees a subminimum wage, but a minimum wage or greater; and it deducts no tip income from any employee's wages. Old Heidelberg has simply followed a "house rule" which is the industry practice, that tips left on table be pooled and distributed among employees who directly provide service to the tipping patron.[2]

We reject plaintiff's contention that employer-mandated tip pooling constitutes a prohibited "taking" by the employer within the meaning of section 351. Such a construction is a strained one, outside of the ambit of the definition of the word "take" contemplated by the Legislature in drafting the statute; and the policy inherent in section 351 bears this out. Consistent with this, the Legislature declared a gratuity to be the "sole property" of the

---

[1] Labor Code section 351: "No employer or agent shall collect, take, or receive any gratuity or a part thereof, paid, given to or left for an employee by a patron, or deduct any amount from wages due an employee on account of such gratuity, or require an employee to credit the amount, or any part thereof, of such gratuity against and as a part of the wages due the employee from the employer. Every such gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for. . . ."

[2] In opposition to motion for summary judgment, plaintiff submitted defendant's signed statement filed with the unemployment office, which spelled out tip pooling—payment of 15 percent of a gratuity to the busboy and 5 percent to the bartender—as "a house rule and is with nearly all Restaurants." Such industry practice was also referred to in oral argument to this court.

"employee or employees" for whom it was left by the tipping patron and further, in section 356, Labor Code,[3] declared the purpose of the article, "to prevent fraud upon the public in connection with the practice of tipping." She argues that tip pooling at the behest of Old Heidelberg constitutes a "taking" by it because it deprived her of the use of that portion of the gratuities she received which the restaurant required her to turn over to the busboys, thus "exerting control rights" or "unlawful dominion" over her personal property; and this violates section 351.

The argument is unsound, first, because it is based on the erroneous assumption that the entire tip left by the patron is the waitress's personal property. To buttress this, much is made of for whom the gratuity is left, the intention of the patron in leaving it, and the lack of evidence offered by Old Heidelberg in this connection. We dare say that the average diner has little or no idea and does not really care who benefits from the gratuity he leaves, as long as the employer does not pocket it, because he rewards for good service no matter which one of the employees directly servicing the table renders it. This, and the near impossibility of being able to determine the intent of departed diners in leaving a tip,[4] in our view, account for the Legislature's use of the term "employees" in declaring that "[e]very such gratuity is hereby declared to be the sole property of the employee or *employees* to whom it was paid, given, or left for." (§ 351, italics added.) It is clear that the Legislature intended by this section to cover just such a situation. More than often the patron decides what is good service by the attention the busboy gives. As a practical matter, if he is attentive to the needs of the patron, filling water glasses promptly, bringing rolls and butter,

---

[3] "The Legislature expressly declares that the purpose of this article [including Labor Code section 351] is to prevent fraud upon the public in connection with the practice of tipping and declares that this article is passed for a public reason and cannot be contravened by a private agreement. As a part of the social public policy of this State, this article is binding upon all departments of the State." (Lab. Code, § 356.)

[4] In oral argument before us reference was made by both parties to credit card invoices used by the restaurant when the patron pays with a major credit card, plaintiff contending that the invoice listing "waiter" and "captain" with a separate line for entry of a gratuity for each, with no mention of "busboy," implies the busboy is not included in the tip. This reference is to a matter outside of our record. However, credit card invoices serve as a poor example in this case, for it is not the restaurant that supplies them to patrons, but the credit card companies that print them, and the invoices really reflect the intent of neither the restaurant nor the patron. Certainly, the credit card company cannot dictate to a restaurant how it shall run its business by singling out who, among its employees rendering service to a table, shall receive a gratuity left by a patron. Given no choice by a credit card invoice which lists only "waiter" and/or "captain," but to tip one or both, how can it be said the patron intended to exclude the busboy? Can that which the credit card company elects to print on its invoice reflect the true intent of the patron if, indeed, he has one at all in leaving the tip? Moreover, all credit card invoices are not the same; some companies leave a box only for a "tip" without specifying for whom it is left, while others list only "waiter," some single out "waiter" and "captain," others leave a blank space.

clearing the table, mopping up spills, pouring coffee, etc., this kind of attention will incline the patron to leave a generous gratuity even though the service rendered by the waiter or waitress may not be all that satisfactory. Conversely, if the busboy is inattentive and his service is slow, sloven or haphazard, the disgruntled patron just as likely will depart leaving less than a respectable tip or nothing at all regardless of the kind of service rendered by the waiter or waitress.

Second, if more than one employee, for example a waitress and a busboy, directly serve the table of a patron, the gratuity is left for the "*employees*" within the meaning of section 351, and thereunder becomes *their* sole property as against the employer, to be equitably distributed between them.[5] Were restaurant employers prohibited from administering tip pooling for equitable distribution of tip income, the gratuity could be picked up and appropriated by the first employee, perhaps the waitress, to reach the table after the diner departs. On the other hand, it as well could be the busboy who reaches the table first and pockets the gratuity to the exclusion of the waitress. Either way, one employee would be depriving the other of the use of his or her own personal property, the very conduct condemned by plaintiff and contrary to the spirit of section 351 which declares such gratuity to be the sole property of the "employees" for whom it was left.

Any claim that "to force a waitress to give part of her tips to a busboy is indirectly, a reduction of minimum wage obligations" contrary to *Industrial Welfare Com.* v. *Superior Court, supra,* 27 Cal.3d 690, 730, and here Old Heidelberg "made the waitresses pay part of what the market required the restaurant to pay busboys," and in either event, "coercing this payment is identical to deducting the funds from [plaintiff's] paycheck," is as ill founded as a claim that the busboy is forced to share 85 percent of the tip with the waitress for the same reason. There is no evidence that either is the case, and it is not disputed that Old Heidelberg pays both waitresses and busboys minimum wage.

Third, an employer-mandated tip pooling policy is one of common sense and fairness, and protects the public, the employees and the restaurant employer. The public leaves a tip for those employees who actually service the table, and has a right to expect that those employees receive the gratuity to the exclusion of the employer. Under the tip pooling arrangement in this case, there is no way in which a gratuity can be appropriated by the employer either for himself or to make up part of an employee's wages; and,

---

[5] It seems fair to require a waitress to share the tip with the busboy who buses her table, for were it not for the busboy, the work ordinarily performed by him would fall upon the waitress who, in addition to her own work, would have the responsibility of his duties.

in the spirit of the purpose declared in section 356, no fraud can be perpetrated "upon the public in connection with the practice of tipping."

Indeed, such tip-pooling practice by the employer protects the personal property of the employees and ensures a fair distribution of the gratuity to those who earned it, making certain that each gets his fair share. This way, distribution of tip income does not depend upon the whim or the generosity of the employee who is first to pick up the tip, and prevents a greedy employee from depriving another of his fair share of the gratuity, or a waitress, plaintiff, for example, from depriving a busboy of his share of a tip because in *her* opinion he has not performed satisfactorily. If a busboy fails to give satisfactory service, it is the responsibility of management, not the waitress, to do something about it.

An established tip-pooling policy encourages employees to give the best possible service. In turn, such service can only enhance the reputation of the restaurant and increase business. To permit a waitress to determine what if anything she should share with the busboy based upon what she deems to be the worth of his service can only lead to the surrender of the employer's prerogative to run his own business, dissension among employees, friction and quarreling, loss of good employees who cannot work in such an environment and a disruption in the kind of service the public has a right to expect. An employer must be able to exercise control over his business to ensure an equitable sharing of gratuities in order to promote peace and harmony among employees and provide good service to the public. To deprive a restauranteur of the ability to regulate and control the conduct of his own business, leaves the door open to anarchy in the restaurant industry. It is for this very reason that employer mandated tip pooling among employees has been a long-standing practice, establishing a policy in the industry which permits the employer to operate a well-run, well-ordered restaurant business. Such a practice serves everyone well—the public, the employees and the employer. We conclude it does not fall within the prohibited conduct of section 351.

■ Called to our attention are two administrative interpretations, the first submitted by plaintiff, the second by defendant. (1) In 1984 the Division of Labor Standards Enforcement (DLSE), Department of Industrial Relations, interpreted section 351 (Interpretive Bulletin 85-4) to permit voluntary tip pooling among participating employees, but to prohibit an employer from making a tip-pooling arrangement a condition of employment. (2) Three years later, in 1987, Joric Parg of Fung Lum Restaurant filed with the California Office of Administrative Law (OAL) a request for regulatory determination of DLSE 1984 Interpretive Bulletin 85-4 to deter-

mine whether or not it was a "regulation" as defined in section 11342, subdivision (b), Government Code, and valid and enforceable if adopted as a regulation and filed with the Secretary of State in accord with the California Administrative Procedure Act (APA). Analyzing Interpretive Bulletin 85-4, the OAL held it to be subject to the requirements of the APA, a regulation as defined therein and invalid and unenforceable; and suspended Interpretive Bulletin 85-4, as of March 25, 1987, concluding "that DLSE's 'preclusion interpretation' is not the only legally tenable interpretation of section 351." (1987 OAL Determination No. 4 [Docket No. 86-010].) The OAL opinion also pointed out that section 351 "sheds no light at all on how to handle a situation in which, for instance, three employees provided significant personal service to a particular patron, who then left behind one sum of money in appreciation of the good service received . . . [I]t would be arguably inconsistent with the statute for an employer faced with the above hypothetical situation to permit one particular employee to keep 100% of the tip." (P. 9.) Actually neither of the foregoing opinions is persuasive in construing section 351 in the context of this case. We agree with plaintiff's statement in her appellate brief that with DLSE's bulletin invalid, "it is for the court to determine the true meaning of the statute."[6]

## II

### THERE IS NO TRIABLE ISSUE RELATIVE TO SPLIT SHIFT PREMIUM

■ Plaintiff contends there is a triable issue of material fact as to whether she was coerced into signing an affidavit that waived her right to a split shift premium, as a condition of her employment. If there is no triable issue, plaintiff is not entitled to recover what she claims to be a split shift premium of $3.35 a day during her employment with defendant—one hour's pay at

---

[6]Primarily the dissent is based upon the premise that the gratuity left by a patron, unless he specifies otherwise, belongs to the waitress alone to the exclusion of the busboy and bartender. We have held that the gratuity, unless otherwise specified by the patron, belongs to the employee who contributed to the service of that patron. Once the gratuity is equitably shared indeed, as urged by the dissent, the property right in "the gratuity an employee receives from a customer must be protected."

We also agree that the law must be "vigilant in its protection of the property rights of ordinary working people." We are just as much concerned about wages and working conditions for and the property rights of waiters and waitresses in eating establishments as is the author of the dissent, but we are just as concerned with the other employees, i.e., busboys and bartenders, who, as well, render service to the same patron. Our ruling is intended to ensure that all such employees be placed in a fair and equitable position. It is because we are not insensitive to the plight of those employees that our ruling allows for a fair distribution of the gratuity to all those who earned it by contributing to the service afforded the patron, which sharing can only promote harmony among the employees, provide a peaceful environment in which to work and improve service to the public.

the minimum wage (Industrial Welf. Com. Wage Order[7] [Cal. Reg. Notice Register 84, No. 23, p. 776]). We recognize that the trial court on motion for summary judgment is not a trier or finder of fact but can only determine if a triable issue of material fact exists. However, in reviewing the affidavit, declaration, deposition and factual matters before the trial court, we conclude that its decision was warranted by the evidence, and that it did not abuse its discretion in granting summary judgment. (Code Civ. Proc., § 437c; *Sawyer* v. *First City Financial Corp.* (1981) 124 Cal.App.3d 390, 406 [177 Cal.Rptr. 398].)

Under penalty of perjury plaintiff signed a waiver of the premium—an affidavit—that her services were available to the restaurant only during its luncheon and dinner business and not during any hours between; that obligations to her family and other commitments prevented her from working during the afternoon hours; and that by limiting her working hours she was able to earn adequate compensation "during hours of my choice and at my convenience." In her deposition, taken *prior* to motion for summary judgment and made part of defendant's motion, she testified that for the first couple of months she worked at night, then began working lunch and dinner, and between those shifts, she would go home; asked if she signed an affidavit concerning split shifts, she answered, "I remember talking about the split shift but I don't recall if I did sign it or not"; when shown the affidavit and asked if she recognized it, she answered, "I really don't know exactly. I don't remember, I don't remember it"; she acknowledged she recognized her signature but when asked if she signed the affidavit, she answered, "I didn't say that, I just don't remember." These, indeed, are strange answers coming from one who claims she was coerced to sign the affidavit as a condition of employment.

Later, in her declaration, plaintiff remembered with clarity the details of her signing the affidavit, and said that shortly after she was hired, her employer presented the statement to her and told her to sign it; she did so because "I did not want to make waves"; she did not know at that time that she would be entitled to extra pay if she worked split shifts and, in fact, was available to work between the lunch and dinner shifts, even though she signed the statement and, when asked to work during that period, she did so; between lunch and dinner, the restaurant did not require a full complement of waitresses and she signed the statement for the restaurant's convenience.

---

[7] "When an employee works a split shift, one hour's pay at the minimum wage shall be paid in addition to the minimum wage for that workday, except when the employee resides at the place of employment."

Plaintiff contends that she created a triable issue on defendant's motion for summary judgment by declaring the affidavit she signed under penalty of perjury to be false and that she was forced to sign it as a condition of her employment. We find no support for any such contention. In none of her documents has she asserted she was required by defendant to sign the affidavit as a condition of employment. She may have lied to defendant for reasons of her own and the affidavit may be false but, we find no element of coercion even in her own declaration. The only reasonable inference from the affidavit, her deposition and her declaration (in which, we assume she made the best showing she could) is that when she switched from night work and started working lunch and dinner, for whatever reason she may have had, she decided she did not want to work in the afternoons, and thus told Old Heidelberg she was unavailable to work the hours between the two shifts, although she really was available; Old Heidelberg, believing her representation to it to be true and that this was her choice, and to protect itself, presented to her the affidavit which she signed; and later when plaintiff discovered she could have been paid a premium for working the split shift had she not signed the affidavit and not gone home for the hours between, and realized that she had made a bad bargain for herself, she changed her mind and tried to avoid its legal effect first, by not remembering the affidavit at all, then by failing to recall whether she ever signed the document, then by recognizing her signature but still not remembering if she signed it. Consistent with her initial reluctance to recall such an affidavit or that she signed it, she ignored the affidavit in her complaint, and in her deposition just could not remember any such affidavit or that she had signed it. It was only after defendant's motion for summary judgment was filed that she dealt with the affidavit, then in her declaration, in which she could have set up her strongest showing, she made no assertion she had to sign the statement as a condition of employment, that defendant told her she had to sign the document or be fired or that if she did not sign the affidavit she could no longer work lunches and dinners.

Whether plaintiff simply preferred split shift employment and for her own reasons wanted the afternoons free, actually was available to work between shifts but wanted to work only hours of her own choice and lied to defendant about her availability to work between lunch and dinner shifts, is beside the point. Assuming the affidavit to be true and she was unavailable to work between shifts and, further, that defendant asked her to sign the affidavit so stating, even as a condition of her continued employment, we find no wrongful conduct and no liability for split shift premium. On the other hand, assuming her affidavit to be false, this in itself is no evidence she was coerced into signing it as a condition of her employment; at most, it shows she lied to her employer for whatever personal reason she might have had (he even may have asked her to work the split shift and she lied so she

would not have to do so), but where is there wrongful conduct? Where in her declaration is there any evidence she was coerced to sign the affidavit, true or false, as a condition of or to keep her employment? She says she signed it because she "did not want to make waves," whatever that might mean—she neglected to tell us. But it does not spell "coercion" in the context of her claim here. If this is what it means or even suggests or had this been true, she doubtless would have told us, because she had no hesitancy in the balance of the same declaration in making clear accusatory statements of coercion in connection with tip pooling—that when she was hired, and throughout her employment she was told she "had" to pool her tips, "I complied in order to keep my job," and when she refused to pool her tips she was fired. Likewise, in her deposition, after admitting her signature to the affidavit, plaintiff did not even suggest she was coerced into signing it or had to do so as a condition of her employment, immediately thereafter testifying in the same deposition that her employer "*required*" her to share tips with the busboy.

We see no abuse of judicial discretion in finding no triable factual issue of material fact.

### DISPOSITION

The judgment is affirmed.

Woods (Fred), J., concurred.

**JOHNSON, J.**—I respectfully dissent.

Contrary to my colleagues I am convinced a triable issue exists whether a restaurant knowingly had one of its waitresses sign a false affidavit in order to deprive her of the "split shift premium" to which she otherwise would have been entitled. I further am convinced that Labor Code section 351 prohibits a restaurant from compelling a waitress to share her tips with a busboy or bartender.

The majority and I differ significantly in our view of the facts. Accordingly, I will summarize briefly my version to establish a framework for discussion of the legal issues.

The appellant, Marilena Leighton, began working as a waitress at respondent's restaurant, Old Heidelberg, in August 1984. At that time she signed an affidavit under penalty of perjury stating she could not work during the middle of the afternoon. The affidavit further recited that for her own

convenience she was only employed for the lunch hour and the dinner hour. (Because of the facts stated in this affidavit, Old Heidelberg was not required to pay the "split shift premium" the Industrial Welfare Commission regulations impose where employees are required to work split shifts.)

At the time Ms. Leighton was hired and throughout her employment she was required, as a condition of employment, to pay 15 percent of the tips she received to busboys and 5 percent to bartenders. She was required to make these payments out of her tip income even where customers did not order any drinks from the bar.

In early February 1987, Ms. Leighton balked at paying 15 percent of her tip income to the busboys and 5 percent to the bartender. As a consequence she was suspended for 10 days. When she returned she again refused to abide by Old Heidelberg's tip-sharing requirement and was discharged for that reason.

On May 10, 1988, Ms. Leighton filed a complaint in the Los Angeles Municipal Court alleging four causes of action. The first cause of action is for wrongful discharge claiming Ms. Leighton was fired for refusing to abide by an unlawful employer-mandated tip-pooling requirement. The second cause of action is for breach of the covenant of good faith and fair dealing, once again based on the imposition of an unlawful employer-mandated tip-pooling requirement. The third cause of action seeks to recover unpaid split shift premiums required by State of California Industrial Welfare Commission wage orders. And the fourth cause of action seeks to require Old Heidelberg to repay Ms. Leighton all of the tip income she paid over to busboys and bartenders during the period of her employment.

As reported in the majority opinion, the municipal court granted Old Heidelberg's summary judgment motion, the appellate department affirmed, and we transferred the cause to this court for hearing and decision pursuant to rule 62(a) of the California Rules of Court.

This case poses two questions. Contrary to my colleagues, I am convinced there are triable issues as to both major theories of liability in this case. First, a triable issue exists whether Old Heidelberg knowingly took a false affidavit from Ms. Leighton in order to avoid paying her a "split shift premium." The resolution of this triable issue will determine whether she is entitled to recover unpaid "split shift premium" payments for the period of her employment with Old Heidelberg. Second, I find a triable issue exists whether an employer can lawfully impose an employer-mandated tip-split-

ting program, requiring employees who receive tips to share those tips with other employees of the establishment. The resolution of that issue, in turn, will determine whether Old Heidelberg could lawfully discharge Ms. Leighton for refusing to comply with the restaurant's requirement she share her tips with busboys and bartenders.

I.   *There is a Triable Issue as to Whether Appellant Was Coerced Into Signing a False Affidavit in Order to Deprive Her of Her Statutory Right to a "Split Shift Premium."*

My colleagues and I are in agreement that under California law an employee who works a "split shift" is entitled to a wage premium amounting to one hour's wage for each day on which the employee worked a split shift.[1] (As the words imply, an employee works a split shift when her hours of employment are split between two or more periods during the day, divided by a period when the employee does not work and does not receive a wage.) Ms. Leighton's complaint alleges she is owed approximately $1,600 in unpaid split shift premiums at the rate of $3.35 for each day she worked at the Old Heidelberg restaurant.

In support of its summary judgment against this cause of action Old Heidelberg introduced an affidavit Ms. Leighton signed shortly after commencing employment at the restaurant. In this affidavit Ms. Leighton stated she was unavailable to work between the lunch and dinner shifts and thus the split shift was for her convenience and not for that of the restaurant. (If the "split shift" arrangement were for Ms. Leighton's benefit rather than the employer's benefit, then she would not be entitled to the "split shift premium.")[2]

The majority chooses to diminish the significance of Ms. Leighton's response to the summary judgment motion, however, including her declaration this affidavit was false and she only signed it because Old Heidelberg required her to execute the affidavit. Furthermore, in her declaration she testifies she in fact was available to work between lunch time and dinner time.

---

[1] The Industrial Welfare Commission wage order in effect during Ms. Leighton's employment provided "When an employee works a split shift, one hour's pay at the minimum wage shall be paid in addition to the minimum wage for that workday, except when the employee resides at the place of employment." (Cal. Reg. Notice Register 84, No. 23, p. 776.)

[2] The very definition of "split shift" implies the arrangement is for the benefit of the employer: " 'Split shift' means a work schedule which is interrupted by nonpaid nonworking periods established by the employer, other than bona fide rest or meal periods." (Cal. Reg. Notice Register 84, No. 23, p. 773.)

She further testified in the declaration that she had worked straight through between lunch time and dinner time on many occasions when that suited the convenience of Old Heidelberg.

The affidavit Ms. Leighton executed under penalty of perjury and the declaration she submitted also under penalty of perjury in opposition to the motion for summary judgment are in direct conflict. As I see it, these two documents create a factual issue which should be decided at trial before a jury or a judge. A trier of fact who believed Ms. Leighton's declaration could reasonably infer she was required to sign the false affidavit as a condition of her employment in order to save Old Heidelberg the added expense of paying her a "split shift premium." (These premiums are not insignificant. For a full-time employee paid at or near the minimum wage, a split shift premium increases her paycheck by over 10 percent. Conversely, by avoiding that premium, Old Heidelberg can cut an employee's pay by that same 10 percent.)

Employers cannot evade the labor regulations of the State of California through the simple expedient of requiring employees to sign untruthful documents as a condition of employment. If they could, almost any labor regulation could be nullified by having employees lie about how old they were, their citizenship status, what they were paid, what hours they were being required to work, what duties they were being asked to perform, what risks they were being required to take, and the like. Accordingly, if Ms. Leighton's declaration proves accurate and if the trier of fact draws the reasonable inference the affidavit was false and she was required to sign that document as a condition of employment then the affidavit would be of no legal effect. As a result, Ms. Leighton would be entitled to all the unpaid split shift premiums which accumulated during her period of employment with Old Heidelberg. Moreover, under Labor Code section 218.5[3] she also would be entitled to attorney's fees.[4]

If true, Ms. Leighton's declaration describes conduct by an employer which the judicial system of California cannot tolerate. Indeed although Ms. Leighton's complaint does not request punitive damages for this cause of action—while it does for others—this is the very sort of egregious and oppressive conduct which, *if true,* might well support a punitive damage award. (See, e.g., *Hentzel* v. *Singer Co.* (1982) 138 Cal.App.3d 290 [188

---

[3] Unless otherwise specified, all further statutory references are to the Labor Code.

[4] Section 218.5 provides in pertinent part: "In any action for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions, the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of the action . . . ." (§ 218.5.)

Cal.Rptr. 159, 35 A.L.R.4th 1015] [punitive damages authorized where employer retaliated against employee for protesting unhealthful working conditions]; *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314] [punitive damages appropriate where employee discharged for refusal to engage in price fixing as condition of employment].) We are charged with the responsibility of subjecting summary judgments to the closest possible scrutiny. "The summary judgment procedure, inasmuch as it denies the right of the adverse party to a trial, is drastic and should be used with caution. Summary judgment is properly granted only when the evidence in support of the moving party establishes that there is no issue of fact to be tried. . . . [D]oubts as to the propriety of summary judgment should be resolved against granting the motion." (*Gomez* v. *Ticor* (1983) 145 Cal.App.3d 622, 626-627 [193 Cal.Rptr. 600].)

Under this standard of review I see no way of escaping the conclusion a triable issue is created by the conflict between Ms. Leighton's declaration and the affidavit she gave to Old Heidelberg. According to the prevailing law Ms. Leighton's declaration, since it comes from the party opposing summary judgment, is to be "liberally construed." (*Gomez* v. *Ticor, supra,* 145 Cal.App.3d 622, 627.) If so construed, it establishes the falsity of the affidavit Old Heidelberg required Ms. Leighton to sign and Old Heidelberg's knowledge of that falsity. Those are issues of fact that determine whether Ms. Leighton is entitled to recover unpaid "split shift premiums" from Old Heidelberg. In my view, her declaration creates more than "doubts" about the propriety of summary judgment on this cause of action and, accordingly, I would reverse this portion of the judgment.

## II. EMPLOYER-MANDATED "TIP POOLING" VIOLATES LABOR CODE SECTION 351.

The second issue revolves around the proper interpretation of section 351 which reads in pertinent part as follows: "No employer or agent shall collect, take, or receive any gratuity or a part thereof, paid, given to or left for an employee by a patron, or deduct any amount from wages due an employee on account of such gratuity, or require an employee to credit the amount, or any part thereof, of such gratuity against and as a part of the wages due the employee from the employer. Every such gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for . . . ."

Section 356, in turn, emphasizes: "The Legislature expressly declares that the purpose of this article [including section 351] is to prevent fraud on the public in connection with the practice of tipping and declares that this

article is passed for a public reason and cannot be contravened by a private agreement . . . ."

Neither my colleagues nor myself managed to uncover any previous court decision addressing the legitimacy of employer-mandated tip pooling under section 351. Prior decisions instead have focussed on whether this section prohibits employers from using an employee's tip income to discharge the employer's obligation to pay an employee the minimum wage. Thus, in *Industrial Welfare Commission* v. *Superior Court* (1980) 27 Cal.3d 690, 730 [166 Cal.Rptr. 331, 613 P.2d 579] the California Supreme Court held section 351 contemplated "that tips received by an employee would not reduce an employer's minimum wage obligation, either directly or indirectly." And in *Henning* v. *Industrial Welfare Commission* (1988) 46 Cal.3d 1262 [252 Cal.Rptr. 278, 762 P.2d 442] the court struck down a regulation establishing a lower minimum wage for employees who receive tips than for those who do not on grounds it violated section 351.

In reviewing the language of section 351, I heed the cardinal principle of statutory construction to give effect to every sentence and word in the statute. As our high court has stated: " 'We begin with the fundamental rule that a court 'should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' In determining such intent '[t]he court turns first to the words themselves for the answer.' We are required to give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' 'If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose.' '[A] construction making some words surplusage is to be avoided.' 'When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.' 'Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.' " (*Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 658-659 [147 Cal.Rptr. 359, 580 P.2d 1155].) (Citations omitted.)

The respondent, Old Heidelberg, argues that the *sole purpose* of section 351 is to prevent employers from crediting tips against the minimum wage and to require them to pay employees at least the minimum wage in addition to the employees' share of the tips they receive. However, this interpretation turns the first and the last portions of section 351 into mere surplusage.

The first clause of section 351 emphasizes: "*No employer* or agent *shall* collect, *take,* or receive *any gratuity or a part thereof, paid, given to or left*

*for an employee* by a patron, . . ." (Italics added.) Meanwhile, the last sentence in this same section guarantees: "Every such gratuity is hereby declared to be the sole property of the *employee or employees* to whom it was paid, given, or left for." (Italics added.) It is only the middle portion of section 351 which deals with the use of tip income as a deduction from wages the employer owes the employee or as a credit of tip income against wages the employer owes the employee. But the language of section 351 surrounding this very specific limitation of the employers' use of gratuities goes beyond that special situation to declare a much more fundamental proposition—that tips are the "sole property" of the employee and not to be controlled in any way by the employer.

Section 351 expressly states "no employer or agent shall . . . *take* . . . any gratuity or a part thereof paid, given to or left for an employee by a patron . . . ." The term "take" has several meanings, among them "to deprive one of the use or possession of . . . ." (Blacks Law Dict. (5th ed. 1979) p. 1303, col. 2.) That is, it is not necessary that the employer have physically received the gratuity or a portion thereof to violate section 351. It *is only necessary the employer deprive the employee of the use of the* gratuity or a part thereof, as it does by ordering the employee to transfer part of the gratuity to a third person. The criminal law recognizes a "taking" can occur without the "taker" actually receiving the property himself. For instance, extortion is defined as "the obtaining of property from another, with his consent . . . induced by . . . force or fear . . . ." (Pen. Code, § 518.) It has been held that extortion has occurred even where the perpetrator does not handle the money directly, but rather orders the money to be paid over to a third person. (See, e.g., *United States* v. *Bonnano* (9th Cir. 1972) 467 F.2d 14, cert. den. (1973) 410 U.S. 909 [35 L.Ed.2d 271, 93 S.Ct. 964] [conviction of extortion confirmed where victim ordered to pay off loan to a third party hired for the purpose of collection]; *United States* v. *Polizzi* (9th Cir. 1986) 801 F.2d 1543 [victim of extortion ordered by defendant to pay widow of crime boss directly].)

In the instant case, the employer is "taking" a portion of the employee's gratuity through its employer-mandated tip-pooling plan. Old Heidelberg deprived Ms. Leighton of the use of that portion of the gratuities she received which the restaurant required her to turn over to the busboy and the bartender. So Old Heidelberg's employer-mandated tip-pooling requirement contravenes the first clause of section 351 even though its employees are not required to turn over any of their gratuities directly to Old Heidelberg itself. The restaurant is still exercising an unlawful dominion over gratuities their customers intended for the employee to whom they gave those gratuities. Old Heidelberg is doing the prohibited act—it is "tak(ing)

. . . a gratuity or a part thereof paid, given to or left for an employee by a patron."

Not only did Old Heidelberg "take" Ms. Leighton's tips in the sense it deprived her of the use of the 20 percent she was required to share with other employees, the restaurant derived a benefit for itself from the coerced sharing. This kind of employer-enforced tip pooling is just a disguised way of requiring waiters or waitresses to pay the market salaries of busboys and bartenders. This practice benefits the employer by having others pay this salary enhancement. It may also give the employer a competitive edge in hiring and maintaining busboys and bartenders by being able to offer the added attraction of guaranteed tip sharing. Because the tips are distributed in accordance with the employer's directives and in part for his benefit, this exercise of dominion and control over the tips is tantamount to declaring them to be his personal property. This is logically as well as legally inconsistent with the prohibition against "taking" a portion of a gratuity and with the statutory declaration that gratuities are the "sole property" of the employee.

Section 351 guarantees all gratuities shall be the *personal property* of the "employee or employees" to whom they are given. Old Heidelberg claims when a customer leaves a tip he or she leaves it not just for the waiter but for the busboy and the bartender. (Presumably Old Heidelberg is arguing that people who do not order a liquor drink are still intending to give a portion of their gratuity to the bartender.) However, Old Heidelberg submitted no evidence at the summary judgment hearing to support this contention about the intent of customers who leave tips. Indeed the only evidence which either side attempted to introduce was a declaration by the appellant's attorney. He testified to having conducted a poll of approximately 30 restaurant customers all of whom said that when they left a tip it was solely for the waiter or waitress who had served them and not for the busboy or other restaurant employees. This evidence was ruled inadmissible, and properly so.

Surveys are often admitted over the hearsay objection as within the recognized exception for statements of present state of mind, attitude or belief. (See, e.g., McCormick, Evidence (3d 1984) § 208, p. 641; Annot. (1961) 76 A.L.R. 2d 619; 6 Wigmore, Evidence (Chadborne ed. 1976) § 1731, p. 154; 29 Am.Jur.2d, Evidence, § 502, pp. 559-560.) Alternatively, Evidence Code section 801 permits an expert to testify to an opinion based on facts or data that are not admissible in evidence and to testify about this underlying information as long as it is of the "type that reasonably may be relied upon by experts" in the particular field. (Comment to Evid. Code, § 801.) Case specific surveys are generally admissible if they are conducted according to

the principles accepted by social scientists and statisticians for gathering and analyzing survey data. (See, e.g., *Baumholser* v. *Amax Coal Co.,* (7th Cir. 1980) 630 F.2d 550, 552 ["To qualify a study or opinion poll for admission into evidence, there must be a substantial showing of reliability. There must be some showing that the poll is conducted in accordance with generally accepted survey principles and that the results are used in a statistically correct manner."].) Once a survey has been shown to conform to "conventional methodology," its arguable deficiencies usually are said to affect its weight rather than its admissibility. (See, e.g., *Squirt Co.* v. *Seven-Up Co.* (8th Cir. 1980) 628 F.2d 1086.) Evidence Code section 1250 recognizes a present state of mind exception. However, a statement is still not admissible under Evidence Code section 1250 if the statement "was made under circumstances indicating that the statement is not trustworthy." (Comment to Evid. Code, § 1250; see also Evid. Code, § 1252 [statements inadmissible if circumstances indicate lack of trustworthiness].) Since the poll in this case was admittedly a small, informal poll with no attempt to conform to "conventional methodology," the trial court properly found the results of the poll lacking any indicia of reliability or trustworthiness and as such inadmissible.

However, it was not appellant's burden to prove restaurant customers do *not* intend the tips they leave are to be divided among the waiter, the busboy and the bartender. Instead it was Old Heidelberg's burden to prove they *do* intend that result. So the fact the appellant's evidence on this question is inadmissible does not constitute affirmative evidence on the opposite side of the issue. Accordingly, this remains a triable issue.

There is nothing in section 351 which reasonably can be read to support the proposition the *employer* is empowered to decide which employees the restaurant's customers intended to receive the tips they left. The statute sets this up as a matter between the giver—the restaurant customer—and the receiver—the employee (or employees)—for whom the gratuity is left. It would be contrary to the intent that tip income be the "personal property" of the employees involved to give that kind of discretion to the employer.

Old Heidelberg attempts to make much of the presence of the plural word "employees" in the clause containing the personal property guarantee in section 351. This language is necessary to accommodate situations where a customer intends and expressly declares that a given gratuity is intended for two or more employees or where a given customer is actually served by first one waiter then another (because of a change of shifts) and intends that both of them share in the gratuity or where a banquet giver pays a large gratuity intended to be shared by all the waiters who served those attending the banquet. But this does not mean it is up to the employer in the ordinary

situation, without the customers' knowledge, to require the waitress to whom the customer gave the tip to divide that gratuity with other employees the *employer deems* to have been the intended recipient of the customers' largess.

It is apparent in both sections 351 and 356 the Legislature intends that the *customers'* intent be implemented and that gratuities remain the personal property of the individual employee for whom the customer intended the gratuity to represent additional income. If, and only if, the customer intends to reward more than one employee should a given gratuity be deemed the personal property of more than one employee.

It is noteworthy Old Heidelberg did not introduce any evidence that might exist about their customers' intent when they gave gratuities to Ms. Leighton or other waiters or waitresses. For instance, if the credit card slips used at this restaurant listed not just the waiter as the recipient of any entry the customer desired to make for a gratuity but listed "waiter/busboy/bartender" that would have been evidence in support of Old Heidelberg's position. (Conversely, if the credit card form only lists "waiter" or, as is typical, has a separate line for gratuities for "waiter" and "captain" this would be evidence in support of Ms. Leighton's position on this issue.) But significantly, Old Heidelberg introduced no evidence to support its contention their customers intended some substantial portion of the gratuities to be allocated to the busboys and bartenders when they handed their tips to Ms. Leighton or left the tip at the table where she had served them.

If a customer provides a tip by entering a figure on a credit card slip in a box labelled "waiter," it is apparent the customer has paid that tip to the waiter only and not to the waiter, busboy and bartender. Similarly if the customer hands a sum of money to the waiter it is apparent that gratuity is intended for the waiter and the waiter only unless the customer expressly instructs the waiter to divide it with others. If the customer wishes to reward the busboy or bartender as well as the waiter, the customer ordinarily will give some of the money to the waiter, then hand the busboy another sum of money, and give the bartender his own as well. The only situation with any ambiguity is when the customer merely leaves some cash behind on the table. Yet Old Heidelberg introduced no evidence as to the intent of customers who left money behind on tables served by Ms. Leighton. Nor did the restaurant introduce evidence about the general intent of customers who leave money behind after paying their bills at restaurants. Nor did Old Heidelberg introduce any evidence as to the relative frequency with which gratuities were given through entries on credit card slips or the physical

handing over of money to a specific employee versus merely leaving cash on the table.

We find it relevant to observe the Division of Labor Standards Enforcement (DLSE) of the Department of Industrial Relations interpreted Labor Code section 351 to preclude employers from exercising this type of dominion over gratuities received by their employees. In an "interpretive opinion" issued in 1984, DLSE said: "Under Labor Code Section 351, tips are clearly the sole property of the employee or employees to whom they are paid, given or for whom they are left. Therefore, it is *not permissible for an employer to assert dominion* or ownership of any kind *over a tip* left for a waitress or any other employee.

"[Section 351] must be interpreted to mean that an *employer is not permitted to collect tips from one classification of employee* (for example, waitresses) for the purpose of *distributing a portion of these tips to other employees* (for example, *busboys or chefs*). Further, it would not be permissible for an employer to deduct from wages an amount representing all or any portion of tips paid or given to one classification of employee for the purpose of distributing tips to other employees . . . .

"Any *tip pooling arrangement* must be *completely voluntary* on the part of the *participating employees* and must not have originated with the employer. The employer must not request that the employees enter into such an agreement, and any such agreement must be *entirely free of any coercion or duress,* express or implied, exerted by the employer on the employees involved. The employer must not, directly, by implication, or otherwise, convey to the employees involved the idea that the employer wishes or expects the employees to enter into such an agreement, and the *employer must not threaten,* expressly or impliedly, *sanctions* or retaliation of any kind to anyone for not so agreeing.

"The employer *may not make a tip-pooling arrangement* a *condition of employment or continued employment.*" (DLSE, Interpretive Bulletin 85-4, "Tip Splitting—Labor Code Section 351," pp. 1-2, italics added.)

This DLSE "Interpretive Bulletin" was promulgated on August 20, 1985, and was still in effect in February 1987, at the time Old Heidelberg fired Ms. Leighton for refusing to comply with its employer-mandated tip-pooling edict. On March 25, 1987, the Office of Administrative Law (OAL) suspended this "administrative interpretation" on grounds it was in fact a regulation and needed to be reissued with the formalities required of administrative regulations. (1987 OAL Determination No. 4.) Nonetheless, it is instructive the administrative agency charged with the responsibility of

administering Labor Code section 351 has interpreted that statute to ban employer-mandated tip-pooling plans. (See, e.g., *Culligan Water Conditioning* v. *State Board of Equalization* (1976) 17 Cal.3d 86, 93 [130 Cal.Rptr. 321, 550 P.2d 593] ["'an administrative agency's interpretation . . . obviously deserves great weight.'"]; *Los Angeles* v. *Superior Court* (1941) 17 Cal.2d 707, 712 [112 P.2d 10] ["an administrative construction of a statute . . . will be accorded great respect by the courts, and will be upheld, if not clearly erroneous."]; *Bank of Alameda County* v. *McColgan* (1945) 69 Cal.App.2d 464, 470 [159 P.2d 31] ["The rule is that administrative construction is considered when some uncertainty appears."].)

The majority appears to equate the administrative interpretation rendered by the agency charged with enforcing the Labor Code—the Division of Labor Standards Enforcement—and the opinion of the Office of Administrative Law suspending that interpretation. However, these bodies are not equal and are not entitled to the same deference in the courts. The primary rationale for giving credence to administrative interpretations of statutes only supports DLSE and not OAL. That rationale is the presumed expertise of the administrative agency in the narrow range of laws its staff is charged with administering and must deal with on a daily basis coupled with the presumed expertise of the agency in the practical effects of those laws on the industries the agency is regulating. (See, e.g., Jaffee, Judicial Control of Administrative Action (1965) pp. 28-33; *California Hotel & Motel Assn.* v. *Industrial Welfare Com.* (1979) 25 Cal.3d 200, 211-213 [157 Cal.Rptr. 840, 599 P.2d 31]; *Mission Pak Co.* v. *State Bd. of Equalization* (1972) 23 Cal.App.3d 120, 124-125 [100 Cal.Rptr. 69]; *Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 175 [70 Cal.Rptr. 407, 444 P.2d 79].)

DLSE is entitled to the presumption because it has acquired familiarity with the labor laws it enforces and the workplace in which those laws function. OAL has no special expertise in labor law or the workplace. That administrative office merely looked at the language of the statute in the abstract—not as part of the flesh and blood of the workplace—and said it was susceptible of more than one interpretation. The courts are as capable as OAL of that quintessential judicial task. In contrast, we are less well equipped than DLSE to evaluate how this statute will operate in the workplace. Accordingly, in my opinion we have good reason to give more deference to DLSE's interpretation than to OAL's interpretation of section 351.

In no sense should my dissent be read as urging a ban on voluntary "tip-pooling" compacts among employees of a business establishment. Section 351 only prohibits compulsory "tip-pooling" which employers impose on their employees. The Labor Code specifically guarantees that each tip is to be the "personal property" of the employee to whom it is given. But for the

very reason it is the employee's personal property, the employee is free to dispose of that tip in any way he or she desires. This includes entering into an agreement with other employees that all such tips shall be pooled and divided by a formula they all find acceptable. If "tip-pooling" indeed serves the collective interests of Old Heidelberg's employees and not just the profit motives of the employer, we suspect the practice will survive.

I observe once again the administrative agency charged with overseeing enforcement of section 351 interpreted this statutory provision to allow voluntary, employee-initiated tip-pooling arrangements. In Interpretive Bulletin 85-4, DLSE said: "The Division has been asked whether, under Labor Code Section 351, it is permissible for waitresses to enter into an agreement among themselves and/or with other employees to 'split' or 'pool' their tips with busboys and/or other employees . . . .

"It may . . . reasonably be concluded that under . . . Section 351, a tip splitting or tip pooling arrangement (tip pooling) among waitresses, busboys and other employees is permissible if entered into voluntarily by the employees themselves. The agreement would be applicable only to those employees who willingly participate in the agreement, and would not affect any employee who is not a participant . . . .

"It would also be permissible for the employer, with the consent of the employees who have agreed to a tip pooling arrangement, to act as a custodian or trustee of tips for the purpose of distributing the tips, in accordance with the agreement, at intervals not less frequently than every payday." (DLSE, Interpretive Bulletin 85-4, *supra*. pp. 1-2.)

As mentioned earlier, the OAL suspended DLSE Interpretive Bulletin 85-4 because it represented a regulation—not a mere interpretation. Yet, once again, I find it instructive the agency actually charged with responsibility for administering section 351 found the law permitted voluntary, employee-initiated tip-splitting plans but not those employers impose on unwilling employees.

The majority apparently endorses Old Heidelberg's argument that there would be "chaos" in the workplace if employers could not unilaterally decide who was to share in tips and how much each employee was to receive. I submit this underestimates the level of collective collaboration a group of employees can achieve even in the absence of a union presence on the premises. And it completely overlooks the role a union can play in those restaurants and other businesses which have been unionized. I also find it revealing that the agency with the most experience in how laws affect the workplace—DLSE—expressed no concern enforcement of section 351 to

bar employer-dictated tip-pooling would somehow lead to "chaos" in the affected businesses. Can we really say the courts are in a better position to evaluate the employers' claim that the "sky is falling" than the agency which on a daily basis is called upon to balance employer and employee claims about what will happen in the workplace if this or that restriction is imposed? I think not.

Still, the most important reason for rejecting Old Heidelberg's claim of "chaos in the workplace" is the language of section 351 itself. The Legislature chose to declare gratuities are the personal property of the employees and to deny employers any dominion over that personal property. If the Legislature had wanted to confer on employers the power and responsibility to decide whose personal property those gratuities represented and in what proportions it could have done so. But our lawmakers instead chose to deny employers this power and responsibility in unequivocal terms. The proper forum for Old Heidelberg's argument that employers must play this role to avoid "chaos"—assuming the argument has any merit whatsoever—is the Legislature not the courts. In the absence of the evidence Old Heidelberg failed to produce in this case—evidence that people giving or leaving tips for waitresses in restaurants intend those tips to be shared with busboys and bartenders and whoever else the employer designates—some might doubt whether Old Heidelberg would convince many legislators to amend the law to give it authority to divide tips among its employees. Nonetheless, that is the proper forum for the plea.

Finally, Old Heidelberg argues Ms. Leighton was aware of the employer-mandated tip-pooling requirement at the time she accepted employment at the restaurant. Furthermore, she signed a statement under penalty of perjury that she could not work between the lunch and dinner shifts. Accordingly, Old Heidelberg urges, having accepted employment under these conditions, she is not entitled to complain if she is discharged for suddenly refusing to continue complying with the requirement. Nor is she entitled to renege on her affidavit.

The public policy of the State of California cannot be so easily defeated. The employer-mandated tip-pooling arrangement was unlawful under section 351 unless Old Heidelberg can prove its customers intended the gratuities it gave to Ms. Leighton were to be shared with the busboys and bartenders. An employee cannot be compelled to continue in an unlawful arrangement merely because she accepted those terms in order to gain and retain her employment.[5]

---

[5] For example, section 432.5 provides that "No employer . . . shall require any employee or applicant for employment to agree, in writing, to any term or condition which is known by

Civil Code section 1441 provides "A condition in a contract, the fulfillment of which is impossible or unlawful, . . . is void." The condition Old Heidelberg imposed requiring Leighton to turn over part of her tip income to the busboys and bartenders is unlawful and thus void and unenforceable. Nor can an employee be discharged for refusing to continue going along with an unlawful practice. (See, e.g., *Tameny* v. *Atlantic Richfield Co., supra*, 27 Cal.3d 167 [tort action for wrongful discharge may lie if the employer conditions employment upon required participation in unlawful price fixing by the employee]; *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] [reaffirmed validity of wrongful discharge causes of action in tort because they vindicate the public interest by not permitting employers to impose as a condition of employment a requirement that an employee act in a manner contrary to fundamental public policy]; *Petermann* v. *International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184 [344 P.2d 25] [employee wrongfully discharged for refusing to commit perjury]; *Garcia* v. *Rockwell Internal. Corp.* (1986) 187 Cal.App.3d 1556] [232 Cal.Rptr. 490 [disciplinary action taken against employee for reporting to authorities policy of overcharging time inappropriate]; *Dabbs* v. *Cardiopulmonary Management Services* (1987) 188 Cal.App.3d 1437 [234 Cal.Rptr. 129] [employee wrongfully discharged in retaliation for refusing to continue to work in conditions which endangered health and safety of patients under her care].)

To allow employers to impose illegal work rules as a condition of employment or to allow employers to discharge employees for failing to abide by these illegal requirements would nullify most laws designed to govern the work place. Particularly in times when jobs are difficult to find, an employer can find people willing to sign almost any document and to accept any terms even those which directly violate the Labor Code. That does not make those coerced documents legally valid nor does it make those coerced terms of employment legally binding.

Having considered all the legal arguments, I am left with the fact there are triable issues on the three causes of action based on the employer-dictated tip-pooling arrangement. Indeed to find otherwise I would have to accept absurd propositions, such as that as a *matter of law* it can be said customers who only order water, milk, coffee or tea intend that 5 percent of the tip they personally hand to their waitresses is to become the "personal property" of the *bartender*. Old Heidelberg understandably introduced no evidence to that effect in the trial court. So I would have to accept this extraordinary statement about human nature as self evident, as something I

---

such employer . . . to be prohibited by law." Analogous statutes in the Civil Code also make unlawful conditions in contracts void and unenforceable.

am to regard as not requiring proof of any kind. For, if proof is required, it was not forthcoming and so the issue remains in dispute as a classic "triable issue." Similarly, there is a triable issue whether customers intended that *15 percent* of the tips they personally gave to their waitresses was to be the "personal property" of the busboys. Old Heidelberg's position on this issue is somewhat less incredible. But it is not something I am persuaded is true as a *matter of law.*

In conclusion, I am concerned we are dealing too lightly in this case with a person's property rights. Through section 351 the Legislature has given legislative recognition and statutory protection to a species of property—the gratuity an employee receives from a customer. In a very real sense, these gratuities are a form of property right. (Indeed to Ms. Leighton this may be the most important property right she possesses—since tips may represent the bulk of her annual income.) As such this property right is entitled to the same level of legal protection and the same degree of judicial scrutiny as a house or land or furniture a person might own.

The contours of this property right are dictated by the intent of the giver—that is, the customer—and not the preferences of the employer. Nor does the law delegate to employers the right to "adjudicate" these property rights. In fact, section 351 specifically denies employers that power, in part because the lawmakers recognize employers have an inherent conflict of interest. They can lower their own labor costs and thus raise their own profit margins by deciding a certain way, that is, by deciding those who receive this form of personal property shall share it with others who can then be paid lower than market wages.

The law must be as vigilant in its protection of the property rights of ordinary working people as it is of the property rights of the largest corporation or the wealthiest landowner. How would the courts react if a private person unilaterally decided to divest a business of a fifth of its earnings and hand them over to another businessman? Or to chop off a fifth of a landowner's holdings and give the land to her neighbor?

Would the judges be satisfied by an explanation the appropriation was necessary to prevent "chaos" because the other businessman or neighbor might have a *claim* to some portion of this property? Or would they approve the unilateral transfer on the basis of *speculation* this fifth belonged to the other businessman or the neighbor? I seriously doubt it. Not in the nation where private property is revered as it is perhaps no place else on earth. Instead the courts would insist on convincing *proof* the one-fifth portion actually belonged to the other businessman or the neighbor before they would consider sanctioning the transfer.

I submit Ms. Leighton is entitled to the same careful judicial scrutiny of her property rights—her tips—as the business establishment and landowner are guaranteed to receive when their earnings or holdings are at stake. That is all she asks. And that she most certainly deserves.

For the above reasons, I would reverse the judgment and remand the cause to the municipal court for a trial on the merits.