[No. D053491. Fourth Dist., Div. One. June 2, 2009.]

JOU CHAU et al., Plaintiffs and Respondents, v.
STARBUCKS CORPORATION, Defendant and Appellant.

COUNSEL

Akin Gump Strauss Hauer & Feld, Rex S. Heinke, Catherine A. Conway, Gregory W. Knopp, Jessica M. Weisel, Johanna R. Shargel and Daniel L. Nash for Defendant and Appellant.

Bohm, Matsen, Kegel & Aguilera, A. Eric Aguilera; Law Office of Terry J. Chapko, Terry J. Chapko; Goldstein, Demchak, Baller, Borgen & Dardarian, David Borgen, Laura L. Ho; Rudy, Exelrod & Zieff, Steven G. Zieff, David A. Lowe and Kenneth J. Sugarman for Plaintiffs and Respondents.

## OPINION

**HALLER, Acting P. J.**—Jou Chau, a former Starbucks "barista," brought a class action against Starbucks Corporation (Starbucks) challenging Starbucks's policy permitting certain service employees, known as shift supervisors, to share in tips that customers place in a collective tip box. Chau alleged the policy violates the unfair competition law (UCL) (Bus. & Prof. Code, § 17200) based on a violation of Labor Code section 351.[1] After certifying a class of current and former baristas and conducting a bench trial, the trial court found Chau proved the UCL claim, and awarded the class $86 million in restitution.

Starbucks appeals. We conclude the trial court erred in ruling that Starbucks's tip-allocation policy violated California law. The applicable statutes do not prohibit Starbucks from permitting shift supervisors to share in the proceeds placed in collective tip boxes. The court's ruling was improperly based on a line of decisions that concerns an employer's authority to mandate that a tip *given to an individual service employee* must be shared with other employees. The policy challenged here presents the flip side of this mandatory tip-pooling practice. It concerns an employer's authority to require equitable allocation of tips placed in a collective tip box for those employees providing service to the customer. There is no decisional or statutory authority prohibiting an employer from allowing a service employee to keep a portion of the collective tip, in proportion to the amount of hours worked, merely because the employee also has limited supervisory duties. Accordingly, we reverse the judgment and order the trial court to enter judgment in Starbucks's favor.[2]

---

[1] Labor Code section 351 reads in full: "No employer or agent shall collect, take, or receive any gratuity or a part thereof that is paid, given to, or left for an employee by a patron, or deduct any amount from wages due an employee on account of a gratuity, or require an employee to credit the amount, or any part thereof, of a gratuity against and as a part of the wages due the employee from the employer. Every gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for. An employer that permits patrons to pay gratuities by credit card shall pay the employees the full amount of the gratuity that the patron indicated on the credit card slip, without any deductions for any credit card payment processing fees or costs that may be charged to the employer by the credit card company. Payment of gratuities made by patrons using credit cards shall be made to the employees not later than the next regular payday following the date the patron authorized the credit card payment." All further statutory references are to the Labor Code.

[2] Based on our conclusion, we assume, but do not decide, that Chau had standing under the UCL to enforce section 351. We likewise do not reach Starbucks's arguments that the court erred by (1) certifying the class because of the existence of conflicts among class members and individualized issues; (2) permitting plaintiffs to recover restitution of tips that Starbucks did not retain; (3) failing to set off damages for certain class members; and (4) awarding prejudgment interest. Because we do not reach these arguments, we do not discuss the facts relevant only to these issues.

## FACTUAL AND PROCEDURAL BACKGROUND

Starbucks owns thousands of stores throughout the country, including about 1,350 stores in California, and sells coffee drinks and other related products in these stores. Starbucks stores are staffed by several categories of employees: baristas, shift supervisors, assistant store managers, and store managers.

Baristas are entry-level, part-time hourly employees responsible for customer service related tasks, such as working the cash register and making coffee drinks. Shift supervisors are also part-time hourly employees who perform all the duties of a barista, but are also responsible for some additional tasks, including supervising and coordinating employees within the store, opening and closing the store, and depositing money into the safe. A barista is eligible for promotion to shift supervisor after six months on the job. A store manager is a full-time salaried employee, and has the authority to recruit, hire, promote, transfer, schedule, discipline, and terminate baristas and shift supervisors. In some stores, a store manager is assisted by an assistant store manager, who is also a full-time salaried employee.

Each Starbucks customer is served by a customer service "team," rather than by an individual employee. The team consists of one or more baristas and one or more shift supervisors, who each rotate jobs throughout the day. These jobs include operating the cash register, making coffee drinks, serving pastries, clearing tables, cleaning bathrooms, washing dishes, and stocking product. Store managers and assistant store managers may assist in these duties, but they generally spend only a "very small amount of time" doing so. Shift supervisors generally spend more than 90 percent of their time performing the same service tasks as do the baristas. If there are two shift supervisors assigned to the same shift, one works solely as a barista and one assumes the responsibilities of the "shift lead."

Because of the team-service approach, a collective tip box is provided for those customers who choose to tip the group of employees, rather than an individual. Collective tipping is the norm with occasional instances of individual tipping. Starbucks has a highly detailed written policy for collecting, storing, and distributing these collective tips. This policy requires each store to have a "standard 4" x 4" plexi cube container for tips." The container must be placed near each cash register, and should not have any signs on it. At the end of each day, an employee must store the tips under numerous rules that ensure the security of the tip funds.

Starbucks mandates that the only employees eligible to share in the weekly collective tips are "all baristas and shift supervisors who worked that week."

Store managers and assistant managers are prohibited from receiving any portion of these tips. Additionally, only baristas and shift supervisors are eligible to count and distribute the tips. To calculate the weekly tip distribution, the selected counting employee must (1) determine the total monetary amount from the tip container; (2) calculate the total number of hours worked by all baristas and shift supervisors in the particular store; (3) divide the total amount of hours into the store's total earned tips for the week to obtain the tip hourly rate; (4) multiply each of the barista and shift supervisor hours by the tip hourly rate to determine each employee's tip income; and (5) place each employee's tip income in a sealed envelope, label the envelope with the employee's name, and store the envelope in the safe until the employee is available to take possession of it.

Under Starbucks's policy, the tip boxes are used only for customers who want to pay a collective tip for the entire service team. If a customer wishes to give an individual tip to a barista or shift supervisor, the employee is entitled to keep that tip, and is not required to place the tip in the collective tip box.

In October 2004, Chau, a college student and former barista, brought a class action complaint against Starbucks alleging that Starbucks's policy permitting shift supervisors to share in the collective tips constitutes "Improper Tip Pooling" and violates the UCL and section 351. The complaint described the class as: "All persons who are employed or have been employed by [Starbucks] in the State of California who, within four (4) years of the filing of this Complaint, have worked as a Barista and were required to pool tips with . . . Shift Supervisors."

Over Starbucks's objections, the court certified the class, finding Chau's legal challenge to Starbucks's "tip pooling" policy presents common questions of law and fact. The court later denied Starbucks's motion to decertify the class on several grounds, including conflicts among class members (numerous class members had been promoted to shift supervisors during the class period), and the diverse nature of the schedules worked by baristas and shift supervisors. The court also denied Starbucks's motion for summary judgment and/or summary adjudication on the section 351 and UCL claims.

Before trial, Chau moved to dismiss the section 351 claim and to proceed to trial only under the UCL. Chau stated there was no need to proceed under both statutes because section 351 was the sole legal basis for the UCL claim. Chau further asserted that there would be no right to a jury trial under the UCL based on the labor law violation (see *Hodge v. Superior Court* (2006) 145 Cal.App.4th 278, 284–285 [51 Cal.Rptr.3d 519]), and that a bench trial would be a superior method of resolving the case because "the parties'

dispute is largely a dispute over statutory interpretation" and the UCL claim provides greater relief under a restitution theory. The court granted the motion, and then granted Chau's motion to bifurcate the trial into liability and remedy phases.

In their trial briefs in the liability phase, plaintiffs argued that as a matter of law section 351 prohibits shift supervisors from receiving any proceeds from the collective tip box because a shift supervisor comes within the statutory definition of an "agent." (See § 350, subd. (d).)[3] Plaintiffs argued this rule applied even if the shift supervisor helps serve the customers and the customers intend the shift supervisor to share in the tip. Starbucks countered that a shift supervisor is not an "agent" under the statutory definition, and even if shift supervisors are "agents," section 351 does not prohibit Starbucks from permitting shift supervisors, who perform mainly behind-the-counter service tasks, to share in the collective tips in proportion to the amount of hours they worked.

Plaintiffs thereafter moved in limine to exclude evidence that shift supervisors serve customers. The court granted the motion, stating that it is "irrelevant" that shift supervisors serve customers and "how much time they spend doing that . . . ." The court nonetheless admitted some evidence on this issue at trial.

Based on the court's pretrial rulings, the focus of the trial was on whether shift supervisors are "agents" within the meaning of section 350, subdivision (d). (See fn. 3, *ante.*) In their case, plaintiffs elicited testimony from several Starbucks executives that shift supervisors are authorized to supervise and direct the baristas on the manner in which they perform their jobs. This evidence showed the shift supervisors have the authority to "run a shift," and are in charge of the store when a store manager or assistant manager is not present in the store. During these times, shift supervisors are accountable for ensuring that baristas complete their tasks, and may direct the baristas to perform specific tasks. Shift supervisors also have the authority to send employees home if business is slow, and are responsible for reporting any misconduct by a barista. In some stores, a store manager is present only a small percentage of the time.

In defense, Starbucks presented evidence showing that shift supervisors spend most of their work day (about 90 to 95 percent of the time) performing the same jobs as baristas, and that shift supervisors have no authority to hire,

---

[3] Section 350, subdivision (d) provides that as used in section 351, " 'Agent' means every person other than the employer having the authority to hire or discharge any employee or supervise, direct, or control the acts of employees." An "employee" means "every person . . . rendering actual service in any business for an employer . . . ." (§ 350, subd. (b).)

discipline, or terminate baristas. Starbucks acknowledged that shift supervisors have some limited authority to supervise or direct baristas in their daily job responsibilities, but presented evidence that shift supervisors have no power to enforce these directions (other than to report misconduct to store managers) and have no authority to discipline a barista verbally or in writing or to issue unsatisfactory performance reviews. According to this evidence, shift supervisors are not considered part of "management," and are viewed by baristas as more experienced employees who essentially perform the same job as baristas.

After the liability phase, the court ruled in plaintiffs' favor. The court found that Starbucks's shift supervisors qualify as "agents" under section 350, subdivision (d) because they " 'supervise' " and " 'direct' " the acts of other employees. The court additionally agreed with plaintiffs that as a matter of law section 351 "disqualifies employees who are 'agents' from sharing tips left in communal tip containers if non-agents also receive tips from the tip containers," and that this rule applies "without considering for whom the tips in such containers have been left." Based on these findings, the court ruled that Starbucks's tipping policy violates "section 351 and is an unlawful business practice in violation of [the UCL]."

After the second phase of the trial, the court found plaintiffs were entitled to (1) restitution from Starbucks of all tips paid to shift supervisors from the collective tip boxes during the class period, which the court found to be $86,687,927 plus 7 percent prejudgment interest, and (2) an injunction prohibiting Starbucks from continuing to distribute tips from the collective tip boxes to shift supervisors. After entering judgment reflecting these findings, the court granted Starbucks's motion to stay the injunction pending the appeal, but ordered Starbucks to keep accurate records of the amount of tips distributed to shift supervisors.

## DISCUSSION

### I.  Section 351 Does Not Prohibit Starbucks's Tip-allocation Policy

The practice of "tipping the providers of personal service" is a "well-accepted part" of our daily lives. (*Searle v. Wyndham Internat., Inc.* (2002) 102 Cal.App.4th 1327, 1331 [126 Cal.Rptr.2d 231].) It has long been recognized that when customers voluntarily leave tips, it is to reward an *employee's* service and an *employer* has no right to appropriate the tip. (See *Henning v. Industrial Welfare Com.* (1988) 46 Cal.3d 1262, 1275 [252 Cal.Rptr. 278, 762 P.2d 442] (*Henning*); *Leighton v. Old Heidelberg, Ltd.* (1990) 219 Cal.App.3d 1062, 1068 [268 Cal.Rptr. 647] (*Leighton*).) To protect these

expectations, the Legislature enacted the predecessor to section 351 almost 100 years ago. (See *Henning, supra,* at pp. 1270–1275; *Etheridge v. Reins Internat. California, Inc.* (2009) 172 Cal.App.4th 908, 916 [91 Cal.Rptr.3d 816] (*Etheridge*).) In 1937, the Legislature moved this measure into section 351, and then substantially amended the code section in 1975. (See *Henning, supra,* at pp. 1270–1275 [extensive discussion of § 351's legislative history]; *Etheridge, supra,* at pp. 916–918.)

■ In its current version, section 351 precludes an employer or its agent from taking any portion of an employee's tip. This portion of the statute states: "No employer or agent shall collect, take, or receive any gratuity or a part thereof that is paid, given to, or left for an employee by a patron . . . . Every gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for." (§ 351; see fn. 1, *ante.*) Section 351 also prohibits employers from requiring wage deductions based on received tips and protects an employee's rights to tips paid on credit cards. Through these provisions, the Legislature sought to "prevent fraud upon the public" (§ 356), and "ensure that *employees, not employers,* receive the full benefit of gratuities that patrons intend *for the sole benefit of those employees who serve them.*" (*Leighton, supra,* 219 Cal.App.3d at p. 1068, italics added.) The Legislature wanted to protect employees from employers who used their positions to unfairly command a share of the employee's tip. (See *Henning, supra,* 46 Cal.3d at pp. 1275, 1278–1279.)

Section 351 specifically includes an employer's "agent" as a party prohibited from taking or receiving an employee's tip. The trial court found that shift supervisors are "agents" because they have the authority to "supervise" and "direct" the acts of employees. (See § 350, subd. (d); fn. 3, *ante.*) Based on this conclusion, the trial court ruled that as a matter of law Starbucks violated section 351 because the statute prohibits "agents" from sharing tips left in communal tip containers if nonagents also receive tips from the tip containers.

The parties devote substantial portions of their appellate briefs to the issue whether the trial court's "agent" finding was supported by the evidence. We do not decide this issue because we agree with Starbucks's alternate argument that the trial court's legal conclusion was erroneous. Even if shift supervisors can be considered "agents" within the meaning of section 350, subdivision (d), Starbucks did not violate section 351 by permitting shift supervisors to share in the tip proceeds that were left in a collective tip box for baristas *and* shift supervisors.[4]

---

[4] Because our holding is based on an argument repeatedly raised by Starbucks in the trial below and in its appellate briefs, we reject plaintiffs' contention in their petition for rehearing

To explain this conclusion, it is helpful to identify certain facts that are not disputed by the parties.

First, plaintiffs do not dispute that Starbucks customers leave money in the tip boxes for *all* of the employees who provide service to the customer. This undisputed fact comports with common sense. By leaving a tip in a collective tip box, a customer would necessarily understand the tip will be shared among the employees who provide the service. The obvious purpose of a tip box is for the customer to leave a tip to be shared among the service employees. Under Starbucks's policy, if a customer wishes to leave a tip for a particular employee, the customer may do so, and the employee may keep the tip for personal use and is not required to share any portion of the tip. However, if the customer wishes to leave a tip for the "team," the customer leaves the tip in the tip box.

Second, plaintiffs do not challenge that the money left in the collective tip box is to provide a gratuity to the entire "team" of employees who are serving the customer, *and* this service team includes baristas *and shift supervisors*. The evidence and offers of proof established that shift supervisors spend about 90 to 95 percent of their time performing the same service tasks as do the baristas. The evidence further established that a customer would not be capable of distinguishing between the employees who are baristas and those who are shift supervisors. All of these employees rotate among the different jobs (e.g., working the cash register, taking orders, making coffee drinks, serving pastries, stocking store items). Thus, customers who place money in the tip box understand and intend that the money will be shared by the entire team, including baristas and shift supervisors.

Third, plaintiffs are not challenging the manner in which Starbucks requires the collective tip box to be divided. That is, Starbucks maintains a policy under which the money placed in the tip box must be counted on a weekly basis, and each service employee is entitled to an amount in proportion to the number of hours the employee worked in the particular store during that week. As among the baristas, plaintiffs do not claim that this division violates the statute, is inequitable, or that it improperly requires a barista to give another barista a "tip" that was intended for a single employee. Instead, plaintiffs necessarily agree that as among baristas, it is fair and permissible under section 351 to divide the collective tip box by giving each employee an amount that is proportionate with the amount of hours worked by the employee.

Fourth, plaintiffs acknowledge that Starbucks prohibits store managers and assistant managers from participating in the collective tip.

that Starbucks waived the argument and/or that our decision violates Government Code section 68081.

Despite these concessions, plaintiffs argued, and the trial court agreed, that Starbucks's policy permitting shift supervisors to retain their proportionate share of the tips violates the first portion of the first sentence of section 351: "No employer or agent shall collect, take, or receive any gratuity or a part thereof that is paid, given to, or left for an employee by a patron . . . ." (See fn. 1, *ante.*) The trial court interpreted this sentence to mean as a matter of law an "agent" cannot share in tips left in a collective tip box even if the tips were intended for the "agent."

■ This conclusion is unsupported by the statutory language. Section 351 precludes an "employer or agent" from taking a tip that is "paid, given to, or left for an employee." Viewed according to its placement within the sentence, the reference to an "agent" obviously means a person different from the employee whose tip may not be taken. Under the statute's plain meaning, an agent cannot take a tip "paid, given to, or left for" *another* employee. (§ 351.)

Thus, as plaintiffs acknowledged at trial and on appeal, section 351 does not say that an employee (who is also an agent) cannot keep his or her own tip. The code section does not provide that merely because an employee falls within the definition of an "agent" (e.g., someone who has the authority to "supervise, direct or control" another employee), an employer must bar that employee from retaining a tip that was given to him by a customer for services provided to the customer. (§ 350, subd. (d).) This interpretation is reinforced by the second sentence of the statute, which provides: "Every gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for. . . ." (§ 351; see fn. 1, *ante.*) Under this provision, an employer must permit an employee (without regard to the employee's status) to keep a tip "paid, given to, or left for" that employee by a customer. (*Ibid.*)

Because—as plaintiffs concede—section 351 does not prohibit a shift supervisor from keeping gratuities given to him or her for his or her customer services, there is no logical basis for concluding that section 351 prohibits an employer from allowing the shift supervisor to retain *his or her portion* of a collective tip that was intended for the entire team of service employees, including the shift supervisor. In this situation, the shift supervisor keeps only his or her earned portion of the gratuity and does not "take" any portion of the tip intended for services by the barista or baristas. If—as is undisputed here—the tips were left in the collective tip boxes for the baristas and shift supervisors, *and* it was permissible for Starbucks to require an equitable division of the tips according to the number of hours worked by each employee, it is not a violation of section 351 for the employer to maintain a policy ensuring those service employees benefit from a portion of those tips. Because a shift supervisor performs virtually the same service work as a

barista and the employees work as a "team," Starbucks did not violate section 351 by requiring an equitable distribution of tips specifically left in a collective tip box for all of these employees.

This conclusion is consistent with the legislative intent and public policy underlying section 351. The statute seeks to prevent the public from being deceived when leaving tips for the employees (and not the employer). (§ 356.) There is no danger the tipping public is being misled by allowing Starbucks shift supervisors to obtain their fair share of the tipping proceeds. To the contrary, based on the undisputed factual record, when a customer leaves a tip in a collective tip box, the customer necessarily understands the tip is not intended for a particular person and the tip will be divided among the behind-the-counter service employees. It is undisputed that these employees consist of baristas and shift supervisors. It would be inconsistent with the purpose of the statute to *require* an employer to disregard the customer's intent and to instead compel the employer to redirect the tips to only some of the service personnel. Additionally, section 351 was enacted to prevent an employer from pressuring an employee to give the employer tips left for the employee. In the situation here, the baristas are not required to transfer tips to an employer or supervisor that were intended for the barista. Instead, the employer is merely ensuring that the collective tip box is equitably divided so that each service employee receives the amount he or she is due.

## II. *Plaintiffs' Reliance on the* Leighton-Jameson *Line of Cases Is Misplaced*

In urging us to hold Starbucks's policy is unlawful, plaintiffs rely on a line of decisions that have interpreted section 351 in the context of challenges to "tip pooling" policies. (See *Leighton, supra,* 219 Cal.App.3d 1062; *Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138 [131 Cal.Rptr.2d 771] (*Jameson*); *Louie v. McCormick & Schmick Restaurant Corp.* (C.D.Cal. 2006) 460 F.Supp.2d 1153 (*Louie*); *Etheridge, supra,* 172 Cal.App.4th 908; *Budrow v. Dave & Buster's of California, Inc.* (2009) 171 Cal.App.4th 875 [90 Cal.Rptr.3d 239] (*Budrow*).)[5]

Although these decisions provide some helpful guidance pertaining to the legislative history and the purposes of the statute, they are factually and analytically distinguishable from the specific issue presented here. The cases did not concern an employer's authority to determine the proper allocation of

---

[5] In supplemental briefing, plaintiffs cited to two additional decisions, but the California Supreme Court has since granted a review petition in those cases. (*Lu v. Hawaiian Gardens Casino, Inc.* (2009) 170 Cal.App.4th 466 [88 Cal.Rptr.3d 345], review granted Apr. 29, 2009, S171442; *Grodensky v. Artichoke Joe's Casino* (2009) 171 Cal.App.4th 1399 [91 Cal.Rptr.3d 732], review granted June 24, 2009, S172237.)

tips placed in a collective tip box. Instead, they involved the employer's right to require an employee to *share* a tip *paid to or received by the employee*. In each of those cases, the court evaluated an employer policy mandating that an employee contribute a portion of his or her personal tip to a "tip pool" to be shared by other employees. In this case, there was no required "tip pooling." Starbucks's challenged policy involved only the appropriate division of gratuities placed by customers in a tip box to benefit a team of employees. Although superficially the two scenarios may seem similar, they are materially different with respect to the application of section 351. As explained below, the legal principles prohibiting an employer from requiring an employee to share his or her personal tip with the employer's agent ("mandatory tip pooling") do not logically apply to an employer policy requiring equitable apportionment of the proceeds in a collective tip box ("tip apportionment").

### A. Summary of "Mandatory Tip Pooling" Decisions

*Leighton, supra,* 219 Cal.App.3d 1062, is the first California decision to consider the legality of mandatory tip pools and has been widely followed by the Courts of Appeal. In *Leighton*, a waitress brought a wrongful discharge action against her employer, alleging she was improperly fired for refusing to share her tips with the employer's busboys. (*Id.* at pp. 1064–1065.) The trial court granted the employer's summary judgment motion. On appeal, the waitress argued that the employer's policy requiring that she share a tip *paid to her* constituted a " 'taking' " (*id.* at p. 1068), and thus violated section 351's mandate that an employer not "*collect, take, or receive* any gratuity . . . paid, given to, or left for an employee . . ." (§ 351, italics added).

The *Leighton* court rejected this argument for several reasons. First, it observed that a tip left for a waitress is not necessarily the waitress's "personal property" because a customer generally "does not really care who benefits from the gratuity he leaves, as long as the employer does not pocket it." (*Leighton, supra,* 219 Cal.App.3d at p. 1069.) In this regard, the court noted that section 351 contains the phrase " 'employee or *employees*' " (219 Cal.App.3d at p. 1069), and stated that "if more than one employee . . . directly serve the table of a patron, the gratuity is left for the '*employees*' within the meaning of section 351, and thereunder becomes *their* sole property as against the employer, to be equitably distributed between them" (*id.* at p. 1070). The court thus concluded that a gratuity *left for an employee* actually belongs to all of the employees "who contributed to the service of that patron." (*Id.* at p. 1072, fn. 6.) Thus, it does not violate the statute to require a sharing of tips among the service employees. (*Id.* at pp. 1068–1071.)

The *Leighton* court also discussed at length the public policy reasons supporting the legality of "tip pooling" arrangements. (*Leighton, supra,* 219

Cal.App.3d at pp. 1067, 1069–1071.) The court stated the "ruling allows for a fair distribution of the gratuity to all those who earned it by contributing to the service afforded the patron, which sharing can only promote harmony among the employees, provide a peaceful environment in which to work and improve service to the public." (*Id.* at p. 1072, fn. 6.) The court further stated: "An established tip-pooling policy encourages employees to give the best possible service. . . . To permit a waitress to determine what if anything she should share with the busboy . . . can only lead to the surrender of the employer's prerogative to run his own business, dissension among employees, friction and quarreling, loss of good employees who cannot work in such an environment and a disruption in the kind of service the public has a right to expect. An employer must be able to exercise control over his business to ensure an equitable sharing of gratuities in order to promote peace and harmony among employees and provide good service to the public. To deprive a restauranteur of the ability to regulate and control the conduct of his own business, leaves the door open to anarchy in the restaurant industry." (*Id.* at p. 1071.) The court additionally noted that "[t]ip pooling has been around for a long time, as has section 351, and had the Legislature intended to prohibit or regulate such practice, it could have easily done so . . . ." (*Id.* at p. 1067.)

Thirteen years later, a Court of Appeal followed *Leighton*, but held "tip pooling" violated section 351 if a waiter or waitress (a "server") is required to give a share of his or her tips to a manager who is an "agent" under section 350, subdivision (d)'s definition. (*Jameson, supra,* 107 Cal.App.4th at p. 141.) In *Jameson*, the restaurant required each server to share 10 percent of his or her nightly tips with a floor manager who was authorized to hire employees, and to direct and control the servers' acts. (*Id.* at pp. 141–142, 144.) The trial court entered judgment on a jury verdict finding the owner owed a waitress $1,075, consisting of the waitress's tips that had been given to the floor manager, and issued an injunction prohibiting the owner from adhering to the policy. (*Id.* at p. 142.) In affirming, the reviewing court agreed with *Leighton* that "[t]ip pooling is permissible . . ." under California law, but held this rule applies only if the pooling arrangement does not "run afoul of the prohibitions contained in section 351." (*Id.* at p. 143.) The court noted one of those prohibitions is that "an employer or agent [cannot] take any part of a gratuity *given to an employee by a patron* . . . ." (*Id.* at p. 141, italics added.) Thus, the court stated that "Under section 351, tip pooling is only permitted among employees who are neither employers nor agents under section 350." (*Id.* at p. 145.) Applying this principle, the *Jameson* court held

the employer's policy violated section 351 because it required the waitress to share *her* tips with the employer's agent.[6] (107 Cal.App.4th at p. 141.)

Thereafter, three courts extended *Leighton* to the situation where the employer requires waitresses/waiters to share their tips with other restaurant employees who do not provide services directly to the customer's table (e.g., bartenders, dishwashers). (*Etheridge, supra,* 172 Cal.App.4th 908; *Budrow, supra,* 171 Cal.App.4th 875; *Louie, supra,* 460 F.Supp.2d 1153.) Although these courts recognized that *Leighton* used " 'direct table service' " language in its discussion, the courts found *Leighton's* holding and rationale extended "to all employees who contribute to the service of the patron." (*Etheridge, supra,* at pp. 921–922; see *Budrow, supra,* at pp. 878–884; *Louie, supra,* at pp. 1159–1161.) The courts further reasoned that an interpretation of section 351 to allow tip pooling along the customer service chain (and not just table servers) promotes the public policy underlying the statute. As the *Budrow* court explained: "Section 351 provides that the tip must have been 'paid, given to, or left for' the employee. Given that restaurants differ, there must be flexibility in determining the employees whom the tip was 'paid, given to, or left for.' . . . Ultimately, the decision about which employees are to participate in the tip pool must be based on a reasonable assessment of the patrons' intentions. It is, in the final analysis, the patron who decides to whom the tip is to be 'paid, given to, or left for.' It is those intentions that must be anticipated in deciding which employees are to participate in the tip pool." (*Budrow, supra,* at pp. 882–883.)

### B. *Tip-pooling Decisions Not Applicable to Tip-allocation Policies*

The trial court here read *Leighton-Jameson* as establishing a blanket rule that an agent (as defined in § 350, subd. (d)) may never share in a "tip pool" with other employees. We agree with this interpretation of *Leighton* and *Jameson* as applied to a tip-pooling arrangement, whereby an employee is compelled to place his or her personal tips (or a portion of the tips) into a "pool" to be shared with other employees. Under the holdings and rationale of these cases, an employer violates section 351 if it requires an employee to give up any part of his or her tip for the benefit of the employer's agent. (See § 351 ["No employer or agent shall collect, take, or receive any gratuity or a part thereof that is paid, given, or left for an employee by a patron . . . ."]; *Jameson, supra,* 107 Cal.App.4th at p. 145.) Thus, under *Leighton-Jameson,*

---

[6] In dicta, the court expansively interpreted the statutory definition of "agent" to include any employee performing supervisory functions even if the employee does not "spend the majority of his or her time performing such functions." (*Jameson, supra,* 107 Cal.App.4th at p. 144.) Because we do not base our holding on the "agent" issue, we do not express an opinion on the merits of this interpretation.

if Starbucks's policy provided that a barista was required to share any tips specifically *given to him or her* with any employee who comes within the definition of an agent, this policy would violate section 351 because it would improperly allow an agent to take a portion of a gratuity given to another employee.

But these principles are inapplicable here because Starbucks does not have a policy requiring baristas to give *their* tips to a shift supervisor. Specifically, Starbucks does not allow a shift supervisor to "collect, take, or receive" a tip that was "paid, given to, or left for" a barista. (§ 351.) Instead, Starbucks's policy concerns the division of tips that are specifically given to a *group* of employees consisting of baristas and shift supervisors. Starbucks's policy ensures that if a customer places money in a collective tip box with the intention that it be shared among baristas and shift supervisors, each employee will retain his or her fair share of the tip proceeds. In this way, Starbucks effectuates the customer's intent and does not permit the misappropriation of gratuities intended for a certain employee or employees.

Relying on the *Leighton-Jameson* line of decisions, plaintiffs argue that the customer's intention is always "irrelevant" in interpreting section 351. We disagree.

██ The problem facing the *Leighton* court was how to reconcile section 351's language that "[e]very . . . gratuity" is the employee's "sole property" with the long-standing rule in the restaurant industry requiring servers to share portions of their own tips with other employees. (*Leighton, supra,* 219 Cal.App.3d at pp. 1068–1071.) The *Leighton* court recognized that if it were to apply the literal words of the statute, the tip-pooling policy could not stand; i.e., if a tip paid or given to an employee is the employee's "sole property," an employer could not require that it be shared. (§ 351.) To avoid this result, the court declared that when a customer leaves a tip for a waiter or waitress, the customer actually is leaving it for all the employees who directly serve the customer.[7] (*Leighton, supra,* at pp. 1068–1071.)

*Jameson* agreed with this reasoning, but qualified it by noting that it would be improper to presume a customer's intent that an employee share his or her tips with an employer's agent because the statute expressly prohibits an agent from collecting, taking, or receiving a tip *given to an employee.* (*Jameson, supra,* 107 Cal.App.4th at p. 140.) Thus, the *Jameson* court concluded that agents may not share in a "tip pool." (*Id.* at p. 145.) The *Louie, Budrow,* and

---

[7] This principle of implied or presumed customer intent to benefit all service employees was challenged by *Leighton*'s dissenting justice (*Leighton, supra,* 219 Cal.App.3d at pp. 1082–1083 (dis. opn. of Johnson, J.)), and more recently, by the dissent in *Etheridge.* (*Etheridge, supra,* 172 Cal.App.4th at pp. 930–931 (dis. opn. of Klein, P. J.).)

*Etheridge* courts agreed with *Leighton*'s implied "collective" intent rationale and applied it to include all nonagent employees who are in the chain of service, even if they do not come to the customer's table. (*Etheridge, supra*, 172 Cal.App.4th at pp. 921–923; *Budrow, supra*, 171 Cal.App.4th at pp. 878–884; *Louie, supra*, 460 F.Supp.2d at pp. 1159–1161.)

Unlike in the tip-pooling scenario, the problem of seeking to glean or presume a customer's intent is not an issue in this case. It is undisputed (and certainly the only reasonable conclusion) that by placing a tip in a *collective* tip box, the customer understands that this gratuity will be shared by all the service employees—baristas and shift supervisors. Thus, unlike the *Leighton* line of cases, we have no need to adopt a fictional customer intent, or declare that intent does not matter. Further, permitting Starbucks to effectuate the customer's intent by mandating equitable sharing of a collective tip box among these service employees is consistent with *Leighton-Jameson* because it "protects the personal property of the employees and ensures a fair distribution of the gratuity to those who earned it, making certain that each gets his [or her] fair share," and allows the employer to "exercise control over [its] business *to ensure an equitable sharing of gratuities*" among the employees who provide service to the patrons. (*Leighton, supra*, 219 Cal.App.3d at p. 1071, italics added.) Further, there is no danger that Starbucks management or the shift supervisors are placing any unfair pressure on the baristas to give up *their* tips.

Section 351 does not contain any language requiring an employer to ignore undisputed customer intent pertaining to gratuities paid in a collective tip box. Indeed, such an interpretation in this case would violate a fundamental purpose of the statute, which is to "prevent fraud upon the public." (§ 356.) Under section 351, when a customer pays an employee a gratuity, the employee may not be forced to give his or her employer (or employer's agent) the tip or any portion of the tip. But the statute does not say an employee (such as a barista) must be allowed to retain the entire tip given to a *group* of employees.

Plaintiffs argue that if we uphold Starbucks's policy, it would mean that any store manager could also share in the tip proceeds, even if the manager has the power to hire and fire and discipline the employee. Plaintiffs maintain that this result is precisely contrary to the purpose of the statute to ensure that employees, and not employers, benefit from gratuities given by customers.

The argument is unavailing. First, Starbucks's policy absolutely prohibits store managers and assistant managers from collecting any tips in the tip boxes. Thus, the issue is not before us. But more fundamentally, plaintiffs are viewing this case too broadly. Our ruling is based only on the particular and

narrow facts before us. Specifically, the undisputed facts show (1) the vast majority of the time shift supervisors and baristas perform the same jobs; (2) these employees rotate jobs and work as a "team" throughout the day; (3) customers intend that their tips placed in the collective tip boxes collectively reward all of *these* service employees; and (4) Starbucks's manner of dividing the collective tip boxes among the service employees (based on the time worked by each employee) is fair and equitable. If Starbucks was to institute a policy permitting its store managers to share proceeds from a collective tip box, the facts would not be the same and would implicate issues not presented here; therefore our legal reasoning and conclusions would not be controlling.

In a petition for rehearing, plaintiffs challenge statements in our opinion that it was "undisputed" that customers who leave money in a collective tip box intend the tip for employees who provide customer service. They assert that customer intent was not an issue at trial, and note that neither party presented any testimony from a customer as to the customer's subjective intent in placing a tip in a collective tip box or how the customer intended to allocate a tip for more than one employee. Based on this lack of customer intent testimony, plaintiffs argue that we cannot properly refer to the "undisputed" fact that individuals place tip money in a collective tip box intending that the tip proceeds will be shared among service personnel.

The argument is unsupported on factual and legal grounds. Plaintiffs had the burden of proving their claim, and they presented no evidence or argument that customers placed tips in a collective tip box with the understanding or intent to benefit only the barista class of employees. To the contrary, the testimony by baristas and shift supervisors was undisputed that customers leave tips in the collective tip boxes for the service team, which includes both shift supervisors and baristas, and that customers could not distinguish between these employees.

Moreover, it was not necessary for either party to present direct evidence from customers to establish the fact that persons who place tips in a *collective* tip box understand that tips will be divided by the service personnel. Clearly, the tips were left for someone. Whether one presents specific evidence on the issue, considers a dictionary definition, references case law authority, or applies established social mores, it is well established tips are given in return for service. Our statements about undisputed customer intent in leaving a tip in a collective tip box reflect this simple proposition. There is nothing remarkable in concluding, and it follows logically, that the tips were intended for those who provided service. To suggest otherwise ignores reality, something the law does not require.

Additionally, until their petition for rehearing, plaintiffs have never concerned themselves with, or challenged, the manner in which tips are divided among the employees who they claim are legally entitled to share the tips. This case has always been about determining whether California law prohibits a category of Starbucks service employees from sharing in a collective tip; it has never been about determining the manner in which eligible employees share the tip. Nothing in our decision depends on any presumed customer intent with respect to a particular allocation of a tip.

## III. *Conclusion*

The trial court found Starbucks violated section 351 because Starbucks allowed shift supervisors to keep tips they earned while working alongside baristas as part of a customer service team, and because Starbucks did not allow baristas to take the portion of the tips that customers intended for the shift supervisors. Based on this finding, the court ordered Starbucks to pay $86 million in restitution to the baristas.

The court's ruling is unsupported. Section 351 does not contain any language prohibiting an employer from equitably dividing tips placed in a collective box among the employees who provided the service. The trial court's reliance on the "mandatory tip pooling" judicial decisions was misplaced. These decisions were premised on factual scenarios different from here and do not apply where customers leave tips in a collective tip box for service rendered by a "team" of employees.

The court's ruling is also at odds with legislative objectives. Section 351 was enacted to prevent employers and their agents from using their positions of authority to demand that employees give up their earned gratuities as a condition of employment. The undisputed evidence shows that no barista was required to give up any part of a tip left for the barista. Rather, Starbucks's policy ensured the collective tips were equitably distributed to those who earned them.

Section 351 was also enacted to prevent fraud on the tipping public. (§ 356.) The Legislature wanted to prohibit a business owner from deceiving a customer who left a tip for an employee by requiring that the employee later transfer any part of the tip to the employer or the employer's agent. It is undisputed here that the tipping public intended to collectively tip both the baristas and the shift supervisors—for their work as a "team." Requiring these collective tips to be given solely to baristas would mislead the public.

Because the trial court's interpretation of section 351 was not supported by the statutory language and led to a result contrary to the fundamental purpose

of the statutory scheme, it is one that the Legislature could not have intended. We reverse the judgment in its entirety.

## DISPOSITION

Judgment reversed. Respondents to bear appellant's costs on appeal.

McDonald, J., and Irion, J., concurred.

Petitions for a rehearing were denied July 2, 2009, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied September 9, 2009, S174601. Werdegar, J., was of the opinion that the petition should be granted.