[No. H037142. Sixth Dist. Jan. 23, 2013.]

HAIM AVIDOR et al., Plaintiffs and Appellants, v.
SUTTER'S PLACE, INC., Defendant and Respondent.

COUNSEL

Dennis F. Moss, Andrew Kopel; Spiro Moore and Robert Ira Spiro for Plaintiffs and Appellants.

Goldstein, Demchak, Baller, Borgen & Dardarian, Laura L. Ho, Roberta Steele; Winifred Kao; Bianca Sierra; Monali Sheth; Della Barnett, Jocelyn D. Larkin, Michael Caesar; Genevie Gallegos; Catherine Ruckelshaus, Tsedeye Gebreselassie; and Hina B. Shah for Asian Law Caucus, Centro Legal de la Raza, Equal Rights Advocates, The Impact Fund, La Raza Centro Legal, Legal Aid Society-Employment Law Center, National Employment Law Project and Women's Employment Rights Clinic at Golden Gate University as Amici Curiae on behalf of Plaintiffs and Appellants.

McManis Faulkner, James McManis, Sharon Kirsch and Matthew Schechter for Defendant and Respondent.

OPINION

**ELIA, J.**—Plaintiff Haim Avidor (plaintiff) is the lead plaintiff in this class action by current and former card dealers employed by defendant Sutter's Place, Inc., doing business as Bay 101 (often abbreviated by the parties as Bay 101 or the casino), which operated a cardroom in San Jose. Bay 101 required its dealers to contribute a set amount of the gratuities they received from players to a common account, which was distributed to other casino employees each payday. In this action plaintiff has contended that Bay 101 violated Labor Code section 351 by compelling its dealers to participate in this tip-pooling arrangement, thereby creating a cause of action for unfair business practices under Business and Professions Code section 17200 et seq. Plaintiff further contends that this withholding of the dealers' property amounted to violations of the minimum wage law (Lab. Code, § 1197), conversion, and the common count of money had and received. Because we disagree with plaintiff's interpretations of the statutory language applicable to the casino's tip-pooling arrangement, we must affirm the judgment in Bay 101's favor.

*Background*

There were two sides to Bay 101's gaming operation: a poker side and a California games, or "Cal games," side. Patrons paid a fee to play against other patrons rather than against the house. The facility also housed a deli, a hair salon, and a sports bar, all part of Bay 101's business. At the time of trial, Bay 101 employed about 705 employees, of which about 260 were dealers.

The members of the class were dealers who were employed from August 8, 1998, through August 4, 2006. Plaintiff, a dealer on the California games side, was employed by Bay 101 from September 1994 until August 2002. Dealers worked in shifts consisting of 40-minute (previously 30-minute) rounds, or "downs," during which they dealt multiple hands to players before moving to the next table in their rotation schedule. A dealer would average six to eight downs per shift.

The rotation schedule was set by the "lead" floor person, or "lead floor," and maintained by the "floor person" during the dealer's shift. A key role of the floor person was to settle disputes or questions that arose during play at the tables. Dealers were not permitted to become involved in any disputes or challenges; when those occurred, or if the dealer made a mistake, he or she had to summon a floor person (or if that person was unavailable, the lead floor or the shift manager), who had the authority to decide the matter. Dealers were not to question the decision of the floor person at the table, but could pursue the matter later, by discussing it with the lead floor, shift manager, casino coordinator, or dealer coordinator.

Players customarily tipped dealers when they won a hand, by tossing, sliding, or pushing a chip or chips from the pot toward the dealer. Both patrons and dealers occasionally tipped other employees as well. Plaintiff, for example, might tip a porter or waitress when he or she performed a service for him while he was dealing. Customers gave tips to floor people, chip runners, porters, waitresses, and anyone else whom they "felt like tipping," even cashiers.

For several years dealers were required to contribute a set amount per hour ($2.50 by poker dealers, $5 by Cal games dealers) into a tip pool, which was distributed to nondealer employees. The contribution was referred to as the "drop." In 2007 and part of 2008, all dealers dropped $2.50 per hour. Thereafter the casino's policy changed to require dealers to drop $2.50 per down, only for the downs in which they dealt, not for "dead spreads," periods in which no games were played. The parties stipulated that dealers received between $750 and $1,500 in tips per week, and that on any given day they dropped no more than 15 percent of the tips they received from customers.

The recipients of the money in the tip pool changed periodically as Ronald Werner, the general manager, decided both the categories and amount of distributions. In 1998, for example, the recipient categories included floor people, card control, shift managers, surveillance director, surveillance personnel, casino host, porters, and tip pool administrator. After 1998, certain categories were removed, such as the shift manager and surveillance director in February 2001, other surveillance personnel at the end of March 2005, and

tip pool administrator at the end of November 1998. Housekeepers were included by early March 2003. As of trial the designated categories were specified floor persons, casino hosts, porters, card control employees, and housekeeping employees.

Although dealers were not always aware of who was in the tip pool, they were all informed of the policy during the orientation before beginning work at Bay 101. As early as 1995 dealers were instructed to sign a "Tip Pooling Agreement," which they signed in acknowledgment of and agreement to the drop policy.

*Procedural History*

This case began in December 2004, when plaintiff filed class proofs of claims in Bay 101's bankruptcy proceeding. The contested matter was later converted to an adversary proceeding, but eventually the parties stipulated to a dismissal designed to help effect a transfer of the dispute to state court. Plaintiff initiated this action in February 2007, generally alleging that Bay 101 illegally took tips patrons had given to dealers by compelling the dealers to participate in a tip pool.

Plaintiff's second amended complaint, filed on September 3, 2008, alleged seven causes of action: money had and received; breach of contract; collecting and receiving employee wages, in violation of Labor Code section 221; violation of the minimum wage law, Labor Code section 1197; unfair business practices in violation of the unfair competition law (UCL), Business and Professions Code section 17200 et seq.; conversion; and failure to indemnify employees, in violation of Labor Code section 2802.[1] Bay 101 successfully demurred to the second (contract) and third (§ 221) causes of action and later moved for summary judgment, or alternatively, summary adjudication. The court's grant of summary adjudication on the fourth (minimum wage), sixth (conversion), and seventh (indemnification) allegations left only two claims for the May 2011 trial: the first cause of action for money had and received, which was tried to a jury; and the section 17200 claim of unfair business practices, which was tried to the court.

After plaintiff rested, the trial court granted nonsuit on the first cause of action and thereafter granted Bay 101's motion for judgment on the remaining cause of action, pursuant to Code of Civil Procedure section 631.8. On July 12, 2011, the court entered judgment for Bay 101.

---

[1] All further unspecified statutory references are to the Labor Code with the exception of Business and Professions Code section 17200, which is abbreviated as "section 17200" or "the UCL."

*Discussion*

## 1. *Plaintiff's Contentions on Appeal*

The foundation of plaintiff's position is section 351, which states: "No employer or agent shall collect, take, or receive any gratuity or a part thereof that is paid, given to, or left for an employee by a patron, or deduct any amount from wages due an employee on account of a gratuity, or require an employee to credit the amount, or any part thereof, of a gratuity against and as a part of the wages due the employee from the employer. Every gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for. An employer that permits patrons to pay gratuities by credit card shall pay the employees the full amount of the gratuity that the patron indicated on the credit card slip, without any deductions for any credit card payment processing fees or costs that may be charged to the employer by the credit card company. Payment of gratuities made by patrons using credit cards shall be made to the employees not later than the next regular payday following the date the patron authorized the credit card payment."

■ In reviewing the legislative history of the statute, our Supreme Court noted that in its earliest form the statute permitted an employer to deduct tips from an employee's wages as long as the employer conspicuously displayed a notice informing the public of that practice. (See *Henning v. Industrial Welfare Com.* (1988) 46 Cal.3d 1262, 1271–1272 [252 Cal.Rptr. 278, 762 P.2d 442]; see also *Lu v. Hawaiian Gardens Casino, Inc.* (2010) 50 Cal.4th 592, 599 [113 Cal.Rptr.3d 498, 236 P.3d 346] [reviewing legislative history in determining whether statute affords plaintiffs a private right of action].) In its current form, however, section 351 clearly prohibits an employer from paying an employee less than minimum wage because that employee receives additional income in the form of tips. (*Henning v. Industrial Welfare Com., supra*, 46 Cal.3d at p. 1278.) And the statute expressly states that a tip is "the sole property of the employee or employees to whom it was paid, given, or left for." (§ 351.)

Plaintiff essentially argues that Bay 101 has continued to appropriate dealers' property—their tips—in order to "fund part of the costs of employing other employees," those who were "not intended recipients of the tips." He draws a distinction between "given to" and "left for," pointing out that in the casino context, unlike a restaurant setting, customers give tips directly to dealers rather than leaving money on the table for all those who provided service during the visit. Plaintiff maintains that withholding a tip that was "given by a patron to an employee (singular) . . . would necessarily be an illegal repudiation of the 'sole property' and the 'taking, collecting and receiving' provisions of [section] 351."

Plaintiff further argues that the court's preclusion of evidence demonstrating the intent of Bay 101 customers was error, because without such evidence, there is no way to determine to whom tips were "given." Plaintiff insists that "the language of [section] 351 is infused with a need to ascertain intent, because its terms cannot be properly applied without a determination as to who tips were given to/left for." "If the statutory rights of tipped employees to their 'sole property' are to be vindicated, a [c]ourt cannot ignore the statutory implications of tips 'given to' an employee, not left for a group, nor ignore the obligation to 'reasonably assess' tipper 'intent' if a question is raised as to whom the tips at issue were 'given.' "

Given plaintiff's assumption that intent must be determined in order to apply section 351, we consider plaintiff's evidentiary argument first.

## 2. *Exclusion of Tipper Intent*

In anticipation of the jury trial, Bay 101 moved to prevent plaintiff from introducing evidence or argument regarding the casino patron's subjective intent when tipping a dealer. Bay 101 argued that such evidence was irrelevant because tip pools had already been judicially declared to be legal regardless of tipper intent. In addition, if plaintiff were permitted to argue that the patron intends the tip to be the dealer's exclusive property, Bay 101 would have to respond with contrary evidence, thereby prolonging the trial.

Plaintiff agreed that "in the context where a tip is given to a specific employee, [section] 351 does not contemplate inquiry as to the tipper's intent" and that such intent in this case "should not be outcome determinative." Plaintiff emphasized his perceived distinction between the restaurant context, in which tips are "left for" service providers, and the casino context where tips are given directly to a dealer. If the trial court analyzed dealer tips as comparable to " 'left for' tips" at restaurants, then tipper intentions would be relevant. Plaintiff repeatedly emphasized, however, that "[o]bviously, Plaintiff's position is that complex questions of this sort, do not have to be reached by the Court because the tips at issue were 'given to' the Dealers directly, and the express language of [section] 351 completely trumps the need to go into the motivation of card room tippers."

The trial court agreed with both parties that such evidence was irrelevant in the circumstances presented by this case. The court relied on *Leighton v. Old Heidelberg, Ltd.* (1990) 219 Cal.App.3d 1062, 1069–1070 [268 Cal.Rptr. 647] (*Leighton*), where the Second Appellate District, Division Seven, weighed in on the issue of intent by diners in restaurants: "We dare say that the average diner has little or no idea and does not really care who benefits from the gratuity he leaves, as long as the employer does not pocket it, because he rewards for

good service no matter which one of the employees directly servicing the table renders it." (*Id.* at p. 1069.)[2]

On appeal, plaintiff maintains that section 351 unequivocally states that a tip "given to" a dealer is that dealer's property. Had the court allowed evidence of customer intent,[3] he would have been able to prove that tips "given to" him (by tossing, sliding, or pushing chips toward him from the pot) were illegally taken from him by his employer, in violation of the statute. Plaintiff's assumption is that if a tip is given directly to the employee, it must have been intended for that employee, not the broader group of service providers.

Plaintiff does not identify the causes of action that would have been saved if he had been able to introduce evidence of customer intent. However, his emphasis on the language of section 351, his allegation of "fraud on the tipping public," and his assertion of entitlement to restitution under the UCL indicate that it is the fifth cause of action, for unfair business practices, that he believes would have been successful had there been evidence of tipper intent.[4]

Plaintiff fails to convince us that evidentiary error occurred. In pretrial proceedings he readily acknowledged that customer intent is irrelevant when patrons give tips directly to dealers, which is exactly the situation presented here. It makes no difference whether tips "left" in *other* settings, such as restaurants, are intended for just the server, for those providing direct table service,[5] or for any employee designated by the employer (excluding the employer's agent) to share tips.

---

[2] Immediately after imparting this supposition, the court then posited the "near impossibility of being able to determine the intent of departed diners in leaving a tip." (*Leighton, supra,* 219 Cal.App.3d at p. 1069.) We agree with this second observation—which, in our view, precludes any presumptions regarding what diners care about in leaving tips. We decline to venture any unsupported assertions as to the intended recipient or recipients of tips falling within the "left for an employee" clause of section 351. It is unnecessary to do so here in any event, as we are not confronting a situation comparable to a tip left on a table in a restaurant.

[3] Plaintiff does not explain how such intent could have been proved beyond the "direct" method by which a dealer received it and the fact that patrons sometimes gave tips to other employees. This was the evidence he proposed in opposing the motion to exclude evidence of tipper intent.

[4] It is only through Business and Professions Code section 17200 that plaintiff can allege a violation of Labor Code section 351. (*Lu v. Hawaiian Gardens Casino, Inc., supra,* 50 Cal.4th at pp. 600–601 [violations of § 351 can be asserted through the UCL, but not as a private cause of action].)

[5] (See *Budrow v. Dave & Buster's of California, Inc.* (2009) 171 Cal.App.4th 875, 879–882 [90 Cal.Rptr.3d 239] [neither § 351 nor *Leighton* created a "direct table service" limitation on legality of tip pools]; accord, *Etheridge v. Reins Internat. California, Inc.* (2009) 172 Cal.App.4th 908, 922–923 [91 Cal.Rptr.3d 816] [notwithstanding "direct table service" language in *Leighton,* rationale extends to "all employees who contribute to a patron's service"].)

Plaintiff takes a broader approach on appeal, however, arguing that customer intent is relevant even in a direct-tipping casino context. He cites *Chau v. Starbucks Corp* (2009) 174 Cal.App.4th 688 [94 Cal.Rptr.3d 593] and *Budrow v. Dave & Buster's of California, Inc., supra,* 171 Cal.App.4th at page 883 for this general proposition. Neither decision is apposite. In *Chau* the recipients were the entire service team, including baristas and shift supervisors. Because the evidence established that customers left tips in a collective box for the entire team, it made no difference that shift supervisors participated in the pool. Because the employees all rotate among the different jobs at Starbucks, the average customer "would not be capable of distinguishing between the employees who are baristas and those who are shift supervisors." (174 Cal.App.4th at p. 697.) Consequently, the court could infer that "customers who place money in the tip box understand and intend that the money will be shared by the entire team, including baristas and shift supervisors." (*Ibid.*)

█ Clearly *Chau* illustrates the point plaintiff made below: that a tip given directly to an individual employee is distinguishable from those left for a group of employees. But that does not mean that the employee to whom it is given may keep it notwithstanding a policy he or she has agreed to in accepting employment. Section 351 itself prevents employers from collecting and retaining tips "given to" *or* "left for" employees; it does not allow tip pooling only in the latter (group tip) situation while prohibiting the practice in the former (direct tip) situation.

Plaintiff's reliance on *Budrow* is no more helpful to his position than *Chau.* He offers the following text from *Budrow*: "Ultimately, the decision about which employees are to participate in the tip pool must be based on a reasonable assessment of the patrons' intentions. It is, in the final analysis, the patron who decides to whom the tip is to be 'paid,' 'given,' or 'left.' It is those intentions that must be anticipated in deciding which employees are to participate in the tip pool." (*Budrow v. Dave & Buster's of California, Inc., supra,* 171 Cal.App.4th at p. 883.) But the context of this statement is significant. The court was addressing the argument of the plaintiff, a former cocktail server, that he should not have been required to share his tips with bartenders who did not provide direct table service to customers. The court did not require or even endorse the introduction of evidence of customer intent—indeed, it did not mention intent again in the opinion—but merely held that the asserted distinction between direct and indirect service was not expressed in or implied by the language of section 351.

### 3. *Permissibility of Tip Pooling Under Section 351*

█ Having concluded that customer intent is not relevant, we consider generally whether the fact that a tip is given directly to an employee is

material to the legality or illegality of employer-mandated tip pooling. As *Leighton* and subsequent judicial decisions have emphasized, section 351 does not specifically prohibit employer-mandated tip pooling. (*Leighton, supra,* 219 Cal.App.3d at p. 1067.) As the court observed in that case, "Tip pooling has been around for a long time, as has section 351, and had the Legislature intended to prohibit or regulate such practice, it could have easily done so, just as it prohibited the various enumerated employer practices. Further, we find nothing in the legislative history of section 351 or related sections, which precludes such an arrangement. And, as far as we can determine, California has no established policy against tip pooling among employees mandated by the employer." (*Ibid.*)

Plaintiff points out that the Legislature "did not say in [section] 351" that a tip belongs to all service providers "in all service industries, no matter who a tip is given to, no matter who it was intended for." But it did not confine its lawmaking scrutiny to restaurants, either. Similarly, although the focus of the *Leighton* court was on the restaurant business, it did not indicate that its reasoning was inapplicable to other contexts. Plaintiff did not demonstrate below that the long-established practice of tip pooling in restaurants sets food servers apart from those who serve customers in casinos.

■ The purpose of section 351, in both its original and current forms, was to prevent an employer from taking gratuities intended for its employees or from deducting that money from an employee's wages. (See *Henning v. Industrial Welfare Com., supra,* 46 Cal.3d at p. 1278 [employer may not obtain the benefit of employee tips by crediting them against the minimum wage].) Citing *Henning,* the *Leighton* court added: "And the legislative intent reflected in the history of the statute, was to ensure that employees, not employers, receive the full benefit of gratuities that patrons intend for the sole benefit of those employees who serve them. Thus, our Supreme Court has prohibited a reduction, either directly or indirectly, of an employer's minimum wage obligation by virtue of tips received by an employee (*Industrial Welfare Com. v. Superior Court* [1980] 27 Cal.3d 690, 730 [166 Cal.Rptr. 331, 613 P.2d 579]), and employers from paying tipped employees a subminimum wage. (*Henning v. Industrial Welfare Com., supra,* 46 Cal.3d [at p.] 1265.)" (*Leighton, supra,* 219 Cal.App.3d at p. 1068.)

In addition, the Legislature made it clear that it had the public as well as employees in mind when it enacted section 351. Section 356 states: "The Legislature expressly declares that the purpose of this article is to prevent fraud upon the public in connection with the practice of tipping and declares that this article is passed for a public reason and can not be contravened by a private agreement. As a part of the social public policy of this State, this article is binding upon all departments of the State."

 Relying on the language and purpose of the statute, the court in *Leighton* held, "We reject plaintiff's contention that employer-mandated tip pooling constitutes a prohibited 'taking' by the employer within the meaning of section 351." (*Leighton, supra,* 219 Cal.App.3d at p. 1068.) Since that decision, the Legislature has amended section 351 without altering the substance of the prohibition or clarifying the language declaring a gratuity to be "the sole property of the employee or employees to whom it was paid, given, or left for." (Stats. 2000, ch. 876, § 9, p. 6510.) It is an established judicial principle that "when the Legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction. Accordingly, reenacted portions of the statute are given the same construction they received before the amendment." (*Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 734 [180 Cal.Rptr. 496, 640 P.2d 115]; see *Estate of Heath* (2008) 166 Cal.App.4th 396, 402 [82 Cal.Rptr.3d 436] ["[w]hen a statute has been construed by judicial decision, and that construction is not altered by subsequent legislation, it must be presumed that the Legislature is aware of the judicial construction and approves of it"]; accord, *Goldstone v. County of Santa Cruz* (2012) 207 Cal.App.4th 1038, 1047 [143 Cal.Rptr.3d 906].)

Absent any indication that legislative acceptance of employer-mandated tip pooling is confined to restaurants and similar establishments, we cannot see why the practice should be foreclosed in the casino setting. (Cf. *Moen v. Las Vegas Internat. Hotel, Inc.* (D.Nev. 1975) 402 F.Supp. 157, 160 [rejecting casino dealer's challenge to tip pooling under Nev. statute].) Moreover, the benefits to both service professionals and customers, aptly described in *Leighton,* can be extended beyond its restaurant context: "An established tip-pooling policy encourages employees to give the best possible service. In turn, such service can only enhance the reputation of the restaurant and increase business. . . . An employer must be able to exercise control over his business to ensure an equitable sharing of gratuities in order to promote peace and harmony among employees and provide good service to the public." (*Leighton, supra,* 219 Cal.App.3d at p. 1071; see *Budrow v. Dave & Buster's of California, Inc., supra,* 171 Cal.App.4th at p. 882 ["Tip pools exist to minimize friction between employees and to enable the employer to manage the potential confusion about gratuities in a way that is fair to the employees."].)

 Given the absence of legislative intent to prohibit employer-mandated tip pooling, we cannot conclude that the policy at Bay 101 is illegal as a matter of law. Only if the purpose of the statute is contravened by distributing the pool to an employer's "agent," as defined in section 350, can the practice be deemed to violate section 351. To that question we turn next.

## 4. *Distribution to Bay 101 Agents*

Plaintiff contends that even if he could be required to share his tips with other employees, in this case Bay 101 impermissibly included employer agents in the pool, thus enabling him to state a cause of action under the UCL for violating section 351. Section 350, subdivision (d), defines "Agent" as "every person other than the employer having the authority to hire or discharge any employee or supervise, direct, or control the acts of employees."

After hearing extensive testimony and receiving exhibits describing the duties and authority of Bay 101 employees, the trial court found that plaintiff had not met his burden to prove that any recipients of the tip pool could be deemed agents within the meaning of section 350, subdivision (d). Plaintiff challenges this finding with respect to five categories: lead floor, director of surveillance, housekeeping supervisor, services manager, and tournament director. All of these employees, plaintiff claims, were "at times" agents "under a literal application" of section 350, subdivision (d).[6]

Plaintiff does not point to the evidence he claims compels reversal. It is his burden on appeal to demonstrate that no substantial evidence supported the trial court's finding that these employees had no supervisory authority over other employees. Having examined the "actual duties of Bay 101 employees who received distributions," the trial court found that none of them was an agent, as none had "management level authority." Merely "directing another employee in the performance of some of his or her duties" did not amount to the degree of supervision and control possessed by an agent of the employer within the meaning of section 350, subdivision (d). Plaintiff fails to show how this reasoning or its application to the employment situation at Bay 101 was in error.

We further query whether plaintiff's argument is moot in any event. The amount dealers were required to drop each day was a set amount regardless of the number of recipients in the pool. If some of the *recipient* employees were forced to share that pooled money with management, that was a matter

---

[6] Although the role of floor person was an issue at trial, on appeal plaintiff apparently does not contest the court's implied finding that this employee was not an agent. To the extent that his reference to "Floor Managers" is to this function, the evidence was disputed. Plaintiff's witnesses depicted floor persons as supervisors because they had the decisionmaking authority when disputes arose between players at a table or when a dealer made a mistake. Because dealers in such circumstances were to call the floor person immediately and then abide by his or her decision, plaintiff wanted the floor person to be deemed an "agent" within the meaning of section 350 and therefore outside the recipient categories of the tip pool. The casino coordinator, however, described the duty of the floor person as supervising the games, not the dealers.

for their own challenge and did not affect the dealers. Thus, this situation is distinguishable from that of the plaintiff in *Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138 [131 Cal.Rptr.2d 771], on which plaintiff relies. In that case, restaurant servers were required to give 10 percent of their tips to the floor manager who supervised them, thus diluting their own share.[7] If, as we have concluded, dealers can be required to drop a set amount into a pool for *other* employees, it makes no difference to *their* position that some recipients should be disqualified. Because plaintiff could not establish a violation of section 351, the trial court properly granted judgment in favor of Bay 101 on plaintiff's UCL claim.

### 5. *Conversion*

█ "Conversion is the wrongful exercise of dominion over the property of another." (*Oakdale Village Group v. Fong* (1996) 43 Cal.App.4th 539, 543 [50 Cal.Rptr.2d 810].) Proof of conversion requires a showing of ownership or right to possession of the property at the time of the conversion, the defendant's conversion by a wrongful act or disposition of property rights, and resulting damages. (*Id.* at pp. 543–544; *Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066 [80 Cal.Rptr.2d 704].) "Money can be the subject of an action for conversion if a specific sum capable of identification is involved." (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 452 [61 Cal.Rptr.2d 707].)

In Bay 101's summary judgment motion, it argued, among other things, that plaintiff's conversion claim was defeated as a matter of law by the "undisputed" fact that dealers did not own or have the right to possess the entire amount of their tips. The trial court agreed with this assertion: "The Court finds that the tips given to dealers do not belong exclusively to the dealer who receives the tip and, therefore, the dealer does not have ownership or a right to possession of the entire tip."

On appeal, plaintiff insists that the conversion claim was viable because the elements of conversion were met. Addressing the court's reasoning, plaintiff insists that "Bay 101 exercised wrongful dominion over the personal property of dealers inconsistent with the dealers' rights to that property by taking, collecting, and receiving their property as a condition of employment where such employment conditions are illegal."

---

[7] In *Jameson*, the Fourth Appellate District, Division Three, upheld a jury finding that the floor manager of a restaurant was an agent within the meaning of section 350, and therefore was not entitled to 10 percent of servers' tips. The duties of the position under scrutiny included disciplining servers, hiring employees, and recommending their discharge. It was irrelevant that the floor manager performed nonsupervisory duties as well.

The factual premise of this assertion, however, has not been met. Plaintiff cannot establish wrongful dominion over the dealers' personal property without a threshold showing that the money in the tip pool belonged to them. It did not. The dealers acknowledged and agreed to the condition of employment that they would make the "drop" after each shift by contributing a specified amount of their accumulated tips to the tip pool. They understood that this amount was not going to be returned to or kept for them, but would be distributed to other casino employees. Because this arrangement did not violate section 351, the trial court correctly determined, based on undisputed facts, that the dealers did not have ownership or possessory rights in that money. The conversion cause of action was therefore properly adjudicated as a matter of law.

### 6. *Minimum Wage Cause of Action*

■ Bay 101's summary judgment motion also challenged plaintiff's fourth cause of action for violating section 1197, which prohibits the payment of a wage lower than the minimum wage fixed by the Industrial Welfare Commission. In its statement of undisputed facts, Bay 101 asserted that dealers were paid the then current minimum wage in addition to the tips they kept. In order to meet its burden (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 855 [107 Cal.Rptr.2d 841, 24 P.3d 493]), Bay 101 supported this assertion by producing the declaration of its human resources manager, Jennifer Gilbert, who stated that "[i]n addition to any tip kept by a dealer, he or she is also paid the then-current minimum wage for every hour worked at Bay 101." Bay 101 also offered plaintiff's deposition testimony, in which he "presume[d]" that he was paid the minimum wage, and the deposition of the general manager, Ronald Werner, who affirmed that dealers were paid the legal minimum wage.

Bay 101's supporting evidence was sufficient to establish the right to adjudication of this cause of action as a matter of law. Under Code of Civil Procedure section 437c, the burden then shifted to plaintiff to show a triable issue of fact on the question of whether dealer pay fell below the legal threshold. Plaintiff attempted to meet this burden by arguing that notwithstanding the minimum wage amount reflected in his paycheck, there was a triable issue of fact as to whether the net pay he received fell below that amount. The argument was a valid one, but plaintiff failed to support his opposition by citing any evidence that the dealer drop ever exceeded the amount of the dealer's tips. Instead, plaintiff merely cited the same evidence relied on by Bay 101, which clearly showed that dealers were paid minimum wage plus the tips they received, with a deduction of only $2.50 per down. By the time plaintiff submitted his opposition, the parties had stipulated that dealers had never dropped more in the tip pool than they had received in tips;

on the contrary, the amount they dropped into the tip pool did not exceed 15 percent of the amount they received from customers. The trial court recognized these undisputed facts and properly adjudicated the fourth cause of action against plaintiff.

### 7. *Money Had and Received*

In plaintiff's first cause of action, a common count for money had and received, he alleged that at Bay 101's "request and special instance," the class members had expended $7 million or more in tip money which was "their own, individual property pursuant to the common law of gifted property." Dealers, unaware that the tip pool was "unlawful," gave this money to Bay 101 "under duress and as a result of [Bay 101's] exercise of undue influence" in that Bay 101 made compliance a condition of their employment.

"A common count is not a specific cause of action . . . ; rather, it is a simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness, including that arising from an alleged duty to make restitution under an assumpsit theory." (*McBride v. Boughton* (2004) 123 Cal.App.4th 379, 394 [20 Cal.Rptr.3d 115]; accord, *Berryman v. Merit Property Management, Inc.* (2007) 152 Cal.App.4th 1544, 1559–1560 [62 Cal.Rptr.3d 177].) "Although such an action is one at law, it is governed by principles of equity . . . ." (*Mains v. City Title Insurance Co.* (1949) 34 Cal.2d 580, 586 [212 P.2d 873].)

"A cause of action for money had and received is stated if it is alleged [that] the defendant 'is indebted to the plaintiff in a certain sum "for money had and received by the defendant for the use of the plaintiff." ' " (*Farmers Ins. Exchange v. Zerin, supra,* 53 Cal.App.4th at p. 460, quoting *Schultz v. Harney* (1994) 27 Cal.App.4th 1611, 1623 [33 Cal.Rptr.2d 276].) The claim is viable " 'wherever one person has received money which belongs to another, and which in equity and good conscience should be paid over to the latter.' " (*Gutierrez v. Girardi* (2011) 194 Cal.App.4th 925, 937 [125 Cal.Rptr.3d 210], quoting *Weiss v. Marcus* (1975) 51 Cal.App.3d 590, 599 [124 Cal.Rptr. 297].) As juries are instructed in CACI No. 370, the plaintiff must prove that the defendant received money "intended to be used for the benefit of [the plaintiff]," that the money was not used for the plaintiff's benefit, and that the defendant has not given the money to the plaintiff.

In granting Bay 101's nonsuit motion on this claim, the trial court ruled that plaintiff's evidence was "insufficient to establish that the money dropped by the dealers into the tip pool was their money which, in equity and good

conscience, should be returned to them. To the contrary, the evidence [presented by plaintiff] established that the amount of money dropped into the tip pool did not exceed an amount that represented a fair and equitable portion of the gratuities which rightfully belonged to other employees of Bay 101. The money received by Bay 101 belonged to these other employees and was intended to be used for their benefit and not for the benefit of the dealers."

In reviewing the trial court's ruling we independently view the evidence most favorably to plaintiff, " 'resolving all presumptions, inferences and doubts in [his] favor.' " (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656].) We will uphold the judgment for respondent only if there is no substantial evidence to support a judgment for appellant. (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 28 [61 Cal.Rptr.2d 518].) " 'Although a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture, reversal is warranted if there is "some substance to plaintiff's evidence upon which reasonable minds could differ . . . ." ' (*Carson* [*v. Facilities Development Co., supra*, 36 Cal.3d] at p. 839.) In other words, '[i]f there is substantial evidence to support [the plaintiff's] claim, *and* if the state of the law also supports that claim, we must reverse the judgment.' [Citation.]" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1124–1125 [76 Cal.Rptr.3d 585]; see *Burlesci v. Petersen, supra*, 68 Cal.App.4th at pp. 1065–1066.)

Plaintiff insists that there was no evidence that any of the tips at issue were intended for the employees who received the money in the tip pool. He believes that it was "clearly wrong for the Court to take this cause of action away from the jury," because the jury "could have, in these circumstances, decided that in 'equity and good conscience', Bay 101 should pay the money it obtained from Dealers back to them."

Plaintiff's position again rests on an erroneous premise. It is not the customers' intent that is relevant here, but the intent of the dealers in contributing to the tip pool. According to the testimony of plaintiff and other members of the class who testified, each dealer dropped the required amount not only with the understanding of its purpose but with the intention that this money be used for the benefit of the nondealer employees in the recipient categories.[8] As the parties stipulated before trial, every dealer was aware of

---

[8] Plaintiff himself expressed this understanding in describing the routine by which he made his drop into the tip pool each day. The only "benefit" it afforded him, he explained, was that if he did not comply, he would be fired. Laura Crawford, another member of the dealer class, similarly testified that failure to comply would lead to termination. But she understood the policy and in the course of complying, intended that each drop be distributed to the employees

the tip policy and the amount, method, and purpose of the dealer drop.[9] There can be no question that in carrying out the tip policy, dealers intended that the money they dropped be distributed among the pool recipients. The trial court correctly granted nonsuit in these undisputed circumstances.

### *Disposition*

The judgment is affirmed.

Rushing, P. J., and Premo, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 1, 2013, S209035.

---

in the pool. She knew that it was their money and that none of it "would be coming back to [her] or any of the other dealers." Domer Ringuette gave similar testimony. The dealers eventually signed an acknowledgment that they had received a copy of the tip policy and that they would be participating in the tip pool.

[9] Beginning in 2008 every dealer was provided with a copy of the tip policy, which identified the job categories for the distribution of the tip pool.